**[This opinion has been published in *Ohio Official Reports* at 89 Ohio St.3d 551.]**

GREENE COUNTY AGRICULTURAL SOCIETY, APPELLEE, *v.* LIMING ET AL.,

APPELLANTS; MANGAN, APPELLEE.

**[Cite as *Greene Cty. Agricultural Soc. v. Liming*, 2000-Ohio-486.]**

*Torts—Political subdivision tort liability—County agricultural society is a political subdivision pursuant to R.C. 2744.01(F)—Conducting livestock competition at county fair by county agricultural society is a proprietary function pursuant to R.C. Chapter 2744.*

1. A county agricultural society is a political subdivision pursuant to R.C. 2744.01(F).

2. The conducting of a livestock competition at a county fair by a county agricultural society is a proprietary function pursuant to R.C. Chapter 2744.

(No. 99-1755—Submitted May 23, 2000—Decided September 6, 2000.)

APPEAL from the Court of Appeals for Greene County, No. 98-CA-119.

————————————

{¶ 1} This case centers on the showing of a hog, named "Big Fat," by then seventeen-year-old Laura Liming at the 1996 Greene County Fair. Laura Liming entered Big Fat in the hog show at the July 1996 fair as part of a 4-H Club project. Big Fat was named "Reserve Grand Champion," the second highest award for a hog at the show.

{¶ 2} After the conclusion of the fair, appellee Larry Mangan, the president of appellee Greene County Agricultural Society ("the Society"), began an investigation based on information he received indicating that Big Fat may not have been eligible to compete in the hog show. Specifically, Mangan investigated whether Laura Liming had violated an exhibition rule that required that all hogs exhibited at the fair be purchased prior to May 15, 1996.

**{¶ 3}** Mangan's investigation raised suspicions that Big Fat may have been the same hog that was shown under a different name by a different person at the Clinton County Fair earlier in that summer of 1996, and that Laura Liming may have purchased the hog after its showing at the Clinton County Fair. Mangan's investigation revealed that according to the rules of the Clinton County Fair, hogs were required to be slaughtered after that fair's hog show. Mangan became convinced that the hog in question, after its showing at the Clinton County Fair, was sold to Laura Liming rather than being slaughtered. Subsequently, it appears that the Society adopted the report of its Livestock Committee, concluding at a meeting on February 24, 1997, that Laura Liming had violated the fair's rules by purchasing Big Fat after the May 15 purchase deadline and showing the hog at the fair.[1]

**{¶ 4}** The Society imposed sanctions against appellants Laura Liming and her parents James and Diane Liming for their alleged roles in the incident. The Society also sanctioned appellant Kenneth Smith, who allegedly had facilitated the sale of Big Fat to Laura Liming and to whom hogs at the Clinton County Fair were consigned for slaughter. The sanctions included ordering Laura Liming to return all ribbons, trophies, and money received above the consignment price resulting from her exhibition of Big Fat; barring the immediate family of James Liming from participating in the 1997, 1998, and 1999 Greene County Fairs; barring the immediate family of Kenneth Smith from participating in the 1997, 1998, and 1999 Greene County Fairs; and declaring that no individual or group associated with Kenneth Smith would be awarded consignment of 4-H animals shown at the Greene County Fair.

---

1. The parties seem to agree that in this suspected scenario, the act of showing a hog that had previously been shown at another county's fair did not itself specifically violate the rules of the Greene County Fair.

**{¶ 5}** On April 30, 1997, the Society filed suit against the Limings and Smith in the Court of Common Pleas of Greene County in an apparent attempt to enforce the sanctions. The Society also sought compensatory and punitive damages.

**{¶ 6}** On July 17, 1997, the Limings and Smith filed an answer, a counterclaim against the Society, and a third-party complaint against Mangan and others, asserting that no violation of the fair's rules had taken place and that the Society and Mangan had violated their due-process rights and had defamed them in articles about the incident published in the Xenia Daily Gazette. The Limings and Smith sought compensatory and punitive damages and injunctive relief.

**{¶ 7}** The Limings and Smith moved for summary judgment on July 31, 1998, as to the claims in the Society's complaint, arguing that the sanctions could not be enforced because the Society had allegedly not followed its internal procedures in considering the matter. On August 30, 1998, the Society and Mangan moved for summary judgment on the claims raised against them in the counterclaim and third-party complaint, arguing that pursuant to the doctrine of sovereign immunity set forth in R.C. Chapter 2744, the Limings and Smith could not recover on any of their claims.

**{¶ 8}** On September 30, 1998, in two separate decisions, the trial court ruled on the summary judgment motions that had been filed by each side. In one decision, the trial court ruled that the Society was a political subdivision that had engaged in a governmental function, and so found the Society immune pursuant to R.C. Chapter 2744 from all of the counterclaims put forth by the Limings and Smith, and therefore entitled to summary judgment on those claims. Also in that decision, the trial court granted summary judgment to Mangan on the claims raised against him in the third-party complaint, finding that Mangan was entitled to immunity for the claims raised against him individually. The trial court certified its decision pursuant to Civ.R. 54(B).

**{¶ 9}** In its other decision, the trial court overruled the motion for summary judgment filed by the Limings and Smith, determining that genuine issues of material fact existed as to the propriety of the Society's investigation and sanctions. The trial court set a date for trial on the claims raised in the Society's complaint.

**{¶ 10}** The Limings and Smith appealed to the Court of Appeals for Greene County from both decisions of the trial court. The court of appeals determined that only the trial court's summary judgment finding the Society and Mangan to be immune was a final appealable order, and that the other decision denying summary judgment to the Limings and Smith was not.[2] Therefore, in its opinion, the court of appeals addressed only the issues relating to the immunity of the Society and Mangan. The court of appeals affirmed the judgment of the trial court on those issues.

**{¶ 11}** The cause is now before this court pursuant to the allowance of a discretionary appeal.

————————————

*Freund, Freeze & Arnold, Neil F. Freund* and *Lynnette Pisone Ballato,* for appellees Greene County Agricultural Society and Larry T. Mangan.

*David M. Deutsch Co., L.P.A.,* and *David M. Deutsch,* for appellants.

*Betty D. Montgomery,* Attorney General, *Barbara A. Servé* and *Peter M. Thomas,* Assistant Attorneys General, urging affirmance for *amicus curiae* Ohio Department of Agriculture.

*King & Blair* and *James F. Blair,* urging affirmance for *amicus curiae* Ohio Fair Managers Association.

————————————

**ALICE ROBIE RESNICK, J.**

———

2. Even though the trial court included Civ.R. 54(B) language in both of its decisions, only the one involving issues of immunity was deemed to be a final appealable order by the court of appeals.

{¶ 12} The sole issue presented for review is whether the Society is entitled to immunity under R.C. Chapter 2744, so that summary judgment was appropriate as a matter of law.[3]  In the circumstances of this case, this issue has two components:  (1) Is the Society a political subdivision for purposes of R.C. Chapter 2744? and (2) If the answer to the first question is yes, was the Society engaged in a governmental function in performing the actions at issue?  For the reasons that follow, we find that the Society is not immune from suit, and accordingly reverse the judgment of the court of appeals.

I

{¶ 13} Since R.C. Chapter 2744 deals with Political Subdivision Tort Liability, the first question we must answer is whether the Society, as a county agricultural society, is a "political subdivision."  If, as appellants contend, the Society is not a political subdivision, then R.C. Chapter 2744 does not apply to it, it is not immune from suit for that reason, and our inquiry is at an end.  If, on the other hand, the Society is a political subdivision, then we must further consider, as the second component of our inquiry, how other provisions of R.C. Chapter 2744 apply to this case.

{¶ 14} R.C. 2744.01(F) defines a "political subdivision" as "a municipal corporation, township, county, school district, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of the state."  R.C. 2744.01(F) then goes on to set forth a nonexhaustive list of particular

---

3. We note that appellants do not challenge the constitutionality of any aspect of R.C. Chapter 2744. Therefore, our inquiry is confined solely to interpreting the provisions of the relevant statutes. Furthermore, the decision in *Dunn v. Brown Cty. Agricultural Soc.* (1888), 46 Ohio St. 93, 18 N.E. 496, relied upon by appellants, predates R.C. Chapter 2744 by nearly one hundred years, and it appears that a county agricultural society was not designated both "a body corporate *and politic*" by the statutes in effect at the time governing such societies. (Emphasis added.) See 46 Ohio St. at 97-98, 18 N.E. at 498.  That the General Assembly has chosen to designate a county agricultural society as a "body politic" in R.C. 1711.13 is an important factor in our decision.

bodies that fall within the above definition. County agricultural societies are not specifically mentioned in the statute.

{¶ 15} Since the Society does not fall within any of the other groups listed in R.C. 2744.01(F), for it to be a political subdivision it must be a "body corporate and politic responsible for governmental activities." It is clear that a county agricultural society exists "in a geographic area smaller than that of the state," so that statutory requirement is easily met.

{¶ 16} R.C. Chapter 1711 provides for the establishment, organization, and functioning of county agricultural societies. R.C. 1711.13 explicitly provides that "[c]ounty agricultural societies are hereby declared bodies corporate and politic." Therefore, if county agricultural societies are "responsible for governmental activities," then all requirements of R.C. 2744.01(F) are met to qualify the Society for status as a political subdivision.

{¶ 17} Black's Law Dictionary (7 Ed.1999) 167, defines "body politic" as "[a] group of people regarded in a political (rather than private) sense and organized under a single governmental authority."

{¶ 18} This exact issue of whether a county agricultural society is a political subdivision as contemplated in R.C. 2744.01(F) was considered by the Attorney General of Ohio in 1988 Ohio Atty.Gen.Ops. No. 88-034. The issue arose in the context of considering whether a county agricultural society was a political subdivision that could establish and maintain a self-insurance program under R.C. 2744.08(A)(2)(a) to cover tort liability claims against it and whether a county agricultural society was a political subdivision that could join with other political subdivisions in establishing and maintaining a joint self-insurance pool under R.C. 2744.081(A) to pay tort judgments, settlements, and the like relating to acts or omissions of the political subdivision or its employees. In order to undertake those actions, a county agricultural society first had to qualify as a political subdivision pursuant to R.C. 2744.01(F).

{¶ 19} In that opinion, the Attorney General determined that a county agricultural society is a political subdivision and so could undertake the insurance actions at issue relating to tort claims against it. Similarly to the framework of the discussion we have set out above, the Attorney General stated that the only requirement of R.C. 2744.01(F) that required a "detailed analysis" was whether a county agricultural society is responsible for governmental activities.

{¶ 20} The Attorney General acknowledged that "[c]ertainly, county agricultural societies possess some characteristics that suggest that their activities are not governmental." However, the Attorney General nevertheless concluded that county agricultural societies are responsible for governmental activities, and therefore are political subdivisions under R.C. 2744.01(F).

{¶ 21} The Attorney General reasoned that "the primary purpose of county agricultural societies has repeatedly been identified as education." The Attorney General quoted from *State ex rel. Leaverton v. Kerns* (1922), 104 Ohio St. 550, 554-555, 136 N.E. 217, 218: "[A]n agricultural fair is * * * a public institution designed for public instruction, the advancement of learning and the dissemination of useful knowledge." The Attorney General also pointed out that under R.C. 1711.10, the Director of Agriculture may withhold funds for a particular county agricultural society if it is shown that the fair put on by that agricultural society was not of sufficient educational value to justify the expenditure of those funds. The Attorney General further pointed out that "the promotion of educational goals traditionally has been regarded as an appropriate governmental activity," citing as support for that statement *Tilton v. Richardson* (1971), 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790; *Hadley v. Junior College Dist. of Kansas City* (1970), 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45; *Green v. Thomas* (1930), 37 Ohio App. 489, 175 N.E. 226; and *Meyer v. Cleveland* (1930), 35 Ohio App. 20, 171 N.E. 606.

{¶ 22} We are in agreement with the court of appeals that appellants' arguments based on *Hamilton Cty. Bd. of Mental Retardation & Developmental*

*Disabilities v. Professionals Guild of Ohio* (1989), 46 Ohio St.3d 147, 545 N.E.2d 1260, are not on point. The issue in that case was whether the county board was a "person" for purposes of R.C. 119.01(F) who could appeal a decision of the State Employment Relations Board. The issue was not whether the county board was a political subdivision.

{¶ 23} We see no reason to disagree with the conclusion reached by the Attorney General in 1988 Ohio Atty.Gen.Ops. No. 88-034 on this point, the first component of our inquiry.[4] We hold that a county agricultural society is a political subdivision pursuant to R.C. 2744.01(F). We thus agree with the decision of the court of appeals upholding the ruling of the trial court on this question.

II

{¶ 24} Having found that the Society is a political subdivision, we must ask, as the next component of our inquiry, whether the Society is entitled to immunity under the provisions of R.C. Chapter 2744.

{¶ 25} R.C. Chapter 2744 sets out the method of analysis, which can be viewed as involving three tiers, for determining a political subdivision's immunity from liability. First, R.C. 2744.02(A)(1) sets out a general rule that political subdivisions are not liable in damages. In setting out this rule, R.C. 2744.02(A)(1) classifies the functions of political subdivisions into governmental and proprietary functions and states that the general rule of immunity is not absolute, but is limited by the provisions of R.C. 2744.02(B), which details when a political subdivision is not immune. Thus, the relevant point of analysis (the second tier) then becomes

---

4. As further support for the Society's status as a political subdivision, appellees point out that in 1992 Ohio Atty.Gen.Ops. No. 92-078, the Attorney General determined that a county agricultural society's board of directors is a "public body" pursuant to R.C. 121.22 and is subject to the open meeting requirements of that statute. Although we recognize that a "public body" for purposes of R.C. 121.22 is definitely not coextensive with a "political subdivision" pursuant to R.C. Chapter 2744, and we further note that this opinion of the Attorney General relied on the earlier Attorney General opinion in 1988 Ohio Atty.Gen.Ops. No. 88-034 (which appellants argue was wrongly decided), we agree with appellees that the decision in 1992 Ohio Atty.Gen.Ops. No. 92-078 does provide some additional support for the proposition that the Society is a political subdivision.

whether any of the exceptions in R.C. 2744.02(B) apply. Furthermore, if any of R.C. 2744.02(B)'s exceptions are found to apply, a consideration of the application of R.C. 2744.03 becomes relevant, as the third tier of analysis.[5] See *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 28, 697 N.E.2d 610, 614-615. See, also, *Harp v. Cleveland Hts.* (2000), 87 Ohio St.3d 506, 509, 721 N.E.2d 1020, 1023; *Hill v. Urbana* (1997), 79 Ohio St.3d 130, 133, 679 N.E.2d 1109, 1112.

{¶ 26} The exception in R.C. 2744.02(B) implicated by this case that potentially defeats the Society's immunity under the analysis discussed above is R.C. 2744.02(B)(2), which provides that political subdivisions are liable for "negligent performance of acts by their employees with respect to proprietary functions." Appellants claim that the Society was engaged in proprietary functions when it conducted the hog show and the investigation of the alleged Big Fat incident at issue, so that the Society is not immune, and the judgment of the court of appeals should be reversed. Appellees, on the other hand, claim that the Society engaged in governmental functions. If appellees are correct, then R.C. 2744.02(B)(2)'s exception to immunity does not apply, R.C. 2744.02(A)(1)'s general rule of immunity is not defeated, and we must affirm the judgment of the court of appeals.

{¶ 27} The mutually exclusive definitions of "governmental function" and "proprietary function" are set out in R.C. 2744.01. R.C. 2744.01(C)(2) lists specific functions expressly designated as governmental functions, and R.C. 2744.01(G)(2) lists specific functions that are expressly designated as proprietary functions. The activities of the Society at issue in the present case do not fall within either R.C. 2744.01(C)(2) or 2744.01(G)(2). Therefore, to classify the Society's activities, we look to R.C. 2744.01(C)(1)'s definition of "governmental function," which we set out below. See, also, R.C. 2744.01(G)(1)(b), which for our inquiry here defines a

---

5. At some point, R.C. 2744.05 may also become relevant, as R.C. 2744.02(B) is expressly made subject to that section as well.

"proprietary function" as a function that "promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons."

{¶ 28} R.C. 2744.01(C)(1) provides that a governmental function is one that satisfies any of the following tests:

"(a) A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;

"(b) A function that is for the common good of all citizens of the state;

"(c) A function that promotes or preserves the public peace, health, safety or welfare [and] that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons * * *."

{¶ 29} R.C. Chapter 2744 was the General Assembly's response to judicial abolishment of the doctrine of sovereign immunity. See *Franks v. Lopez* (1994), 69 Ohio St.3d 345, 347, 632 N.E.2d 502, 504. In making the distinction between governmental functions and proprietary functions a key component of R.C. Chapter 2744 when it was enacted in 1985, the General Assembly has chosen to embrace a concept that was developed through the case law of this court prior to the adoption of that chapter, even though the concept has been criticized by numerous judges and commentators.[6] See Comment, The Ohio Political Subdivision Tort Liability Act: A Legislative Response to the Judicial Abolishment of Sovereign Immunity (1986), 55 U.Cin.L.Rev. 501, 505-507, 510-521. Those earlier cases can be instructive in illustrating the rationale behind the distinction.

---

6. See, *e.g., Haverlack v. Portage Homes, Inc.* (1982), 2 Ohio St.3d 26, 29, 2 OBR 572, 574, 442 N.E.2d 749, 752 ("Attempts to classify municipal functions into these two categories have caused confusion and unpredictability in the law."); *Hack v. Salem* (1963), 174 Ohio St. 383, 394, 23 O.O.2d 34, 40, 189 N.E.2d 857, 864 (Gibson, J., concurring in judgment) (attempted distinction between governmental and proprietary functions is a "morass of conflict and confusion," "has been difficult and frequently leads to absurd and unjust consequences," and is a " 'bramble bush' * * * which is both faulty and unsuited to modern * * * life").

**{¶ 30}** For example, in *Wooster v. Arbenz* (1927), 116 Ohio St. 281, 284-285, 156 N.E. 210, 211-212, a case considering the immunity of a municipality, this court stated:

"In performing those duties which are imposed upon the state as obligations of sovereignty, such as protection from crime, or fires, or contagion, or preserving the peace and health of citizens and protecting their property, * * * the function is governmental, and if the municipality undertakes the performance of those functions, whether voluntarily or by legislative imposition, the municipality becomes an arm of sovereignty and a governmental agency and is entitled to * * * immunity * * *. If, on the other hand, there is no obligation on the part of the municipality to perform them, but it does in fact do so for the comfort and convenience of its citizens * * * and the city has an election whether to do or omit to do those acts, the function is private and proprietary.

"Another familiar test is whether the act is for the common good of all the people of the state, or whether it relates to special corporate benefit or profit."

**{¶ 31}** The *Wooster* court expounded that "[i]f the function being exercised is proprietary and in pursuit of private and corporate duties, for the particular benefit of the [municipal] corporation and its inhabitants, as distinguished from those things in which the whole state has an interest, the city is liable." 116 Ohio St. at 284, 156 N.E. at 211.

**{¶ 32}** When a political subdivision's acts go beyond governmental functions (and when it acts in a proprietary nature) there is little justification for affording immunity to that political subdivision. "Having entered into activities ordinarily reserved to the field of private enterprise, a [political subdivision] should be held to the same responsibilities and liabilities as are private citizens." *Schenkolewski v. Cleveland Metroparks Sys.* (1981), 67 Ohio St.2d 31, 37, 21 O.O.3d 19, 24, 426 N.E.2d 784, 788.

**{¶ 33}** With the above considerations in mind, we consider the application of R.C. 2744.01(C)(1).

**{¶ 34}** We summarily agree with the court of appeals' determination that the Society's activities implicated in this case do not fall within R.C. 2744.01(C)(1)(a). The functions at issue clearly are not ones "imposed upon the state as an obligation of sovereignty."

**{¶ 35}** As to R.C. 2744.01(C)(1)(b), the trial court based its decision finding the Society immune on this provision, determining that the Society's activities at issue here were "for the common good of all citizens of the state." The court of appeals expressed reservations about the trial court's conclusion in this regard, but declined to definitively rule on the propriety of the trial court's determination, because the court of appeals affirmed the trial court's ruling on other grounds.

**{¶ 36}** We specifically find that the Society's activities do not fall within R.C. 2744.01(C)(1)(b). We agree with the concern voiced by the court of appeals that the trial court's definition of what is for the common good of all citizens of the state is too broad because it would subsume the definition of a governmental function found in R.C. 2744.01(C)(1)(c). As aptly stated by the court of appeals, "Any activity that promotes or preserves the public peace, health, safety, and welfare would also fall within a broad definition of what is for the common good of all citizens of the state, thus obscuring the legislature's purpose in crafting a distinction between activities engaged in or customarily engaged in by nongovernment persons and those that are not. See R.C. 2744.01(C)(1)(c) and (G)(1)(b)." When an appropriately narrow definition of "for the common good of all citizens" is applied, the Society's activities do not fall within R.C. 2744.01(C)(1)(b). The activities at issue benefit only some of the citizens of the state, not all citizens.

**{¶ 37}** The pivotal provision to construe in determining whether the Society engaged in governmental or proprietary functions is R.C. 2744.01(C)(1)(c). The

court of appeals concluded that the Society's activities at issue fall within R.C. 2744.01(C)(1)(c)'s definition of a "governmental function." In reaching this conclusion, the court of appeals reasoned that a county fair promotes the public welfare by educating the public about agriculture and other matters, and further reasoned that a livestock competition is an activity not engaged in or not customarily engaged in by nongovernmental persons.

{¶ 38} As we acknowledged above in considering whether the Society is a political subdivision, there is an educational component to the Society's activities. See *Leaverton,* 104 Ohio St. at 554-555, 136 N.E. at 218. This educational component may perhaps be sufficient to support a finding that the activities at issue promote the public welfare. However, R.C. 2744.01(C)(1)(c) is phrased in the conjunctive, so that the obvious question that must be decided is whether the Society's activities at issue can be classified as governmental functions because they involve "activities that are not engaged in or not customarily engaged in by nongovernmental persons." R.C. 2744.01(C)(1)(c). See, also, R.C. 2744.01(G)(1)(b) (proprietary function involves "activities that are customarily engaged in by nongovernmental persons").

{¶ 39} In resolving this question, we must first recognize that a central consideration within the structure of R.C. Chapter 2744 is the premise that some activities of a political subdivision may be governmental functions, while some other activities are not. Thus, the issue here is not whether holding a county fair is a governmental function; rather, it is the more specific question of whether conducting the hog show at the county fair and conducting the investigation into the allegations of irregularity surrounding the entry of Big Fat in that hog show are governmental functions.

{¶ 40} It is apparent to us that even though conducting a county fair may be an activity not customarily engaged in by nongovernmental persons, conducting a livestock competition *is* an activity customarily engaged in by nongovernmental

persons. Any organization, whether private or public, can hold a competition of this type. The consideration that many such competitions are conducted within county fairs cannot change the fact that there is nothing inherently governmental about them. In this situation, educational value alone is not enough to convert what otherwise would not be a governmental function into something that is a governmental function. We see no reason to distinguish a livestock competition at a county fair from any other similar competition, such as a livestock competition held elsewhere than at a county fair, or a dog or cat show, or an art show, or a chili cook-off, or a beauty pageant, or a car show.

{¶ 41} In a situation such as the present case, when the political subdivision at issue is not one of the bodies specifically mentioned within R.C. 2744.01(F), the exceptions to immunity of R.C. 2744.02(B) should be construed in a way that leads to a finding of immunity for only the central core functions of the political subdivision. If the exceptions in R.C. 2744.02(B) are interpreted too expansively in this situation, the balance of competing interests reflected in the structure of R.C. Chapter 2744 is undermined.

{¶ 42} Unlike the court of appeals, we determine that the Society's activities at issue do not constitute governmental functions, but instead are proprietary functions. We hold that the conducting of a livestock competition at a county fair by a county agricultural society is a proprietary function pursuant to R.C. Chapter 2744. We reverse the judgment of the court of appeals on this issue and remand this cause to the trial court for further proceedings.

{¶ 43} Since we have determined that an R.C. 2744.02(B) exception to immunity applies to the circumstances at issue, our analysis has progressed to the point where the "third tier" of consideration set forth in *Cater* now becomes relevant. As to R.C. 2744.03's application to the Society's immunity, we find that none of the defenses of R.C. 2744.03 applies to this case. The nonliability provisions of that statute must be read more narrowly than the liability provisions

of R.C. 2744.02(B), or the structure of R.C. Chapter 2744 makes no sense at all. See *Hall v. Ft. Frye Loc. School Dist. Bd. of Edn.* (1996), 111 Ohio App.3d 690, 699, 676 N.E.2d 1241, 1247; *Hallett v. Stow Bd. of Edn.* (1993), 89 Ohio App.3d 309, 313, 624 N.E.2d 272, 274*; Stuckey v. Lawrence Twp. Bd. of Trustees* (Aug. 24, 1992), Stark App. No. 8806, unreported, 1992 WL 214485 (Milligan, J., dissenting).

{¶ 44} However, the question of Mangan's personal liability, and how R.C. 2744.03 applies to that, requires a different analysis than we employ with regard to R.C. 2744.03's application to the Society. Of course, if we had found that the Society is not a political subdivision, then Mangan could not qualify as an employee of a political subdivision for R.C. Chapter 2744 purposes, and the trial court's finding that he is immune from suit under R.C. 2744.03(A)(6) on the claims raised against him individually could not stand. However, since we have found that the Society is a political subdivision pursuant to R.C. 2744.01(F), R.C. 2744.03(A)(6) is relevant to the question of Mangan's personal liability.

{¶ 45} R.C. 2744.03(A) specifies that the defenses and immunities contained within that section may be asserted "in connection with a governmental or proprietary function." Therefore, regardless of whether the Society engaged in governmental or proprietary functions in conducting the activities at issue, Mangan will be immune in his individual capacity unless his acts satisfy the standards of R.C. 2744.03(A)(6) exposing him to personal liability. See *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 356, 639 N.E.2d 31, 35.

{¶ 46} The trial court granted summary judgment to Mangan on the issue of his personal immunity, finding that none of the requirements for imposing personal liability on an employee under R.C. 2744.03(A)(6) was met. The trial court specifically found that summary judgment was appropriate because, even if Mangan's conduct may have been negligent, "reasonable minds cannot differ that

[his conduct] did not rise to the level of and constitute malice, bad faith, or reckless conduct."

**{¶ 47}** Appellants, as part of their appeal to the court of appeals, challenged the trial court's finding that Mangan was entitled to personal immunity under R.C. 2744.03(A)(6). The court of appeals affirmed the judgment of the trial court on this issue, finding that there was no evidence that Mangan acted with ill will, malice, or bad faith in conducting his investigation, that reasonable minds could not differ on whether Mangan acted recklessly in his investigation, and that there was no genuine issue of material fact that any comments Mangan made were outside the scope of his employment or made with ill will or malice.

**{¶ 48}** Because we have found that the Society is not immune, and because this matter is being remanded to the trial court for further proceedings, further facts may emerge regarding the propriety and details of Mangan's actions. Given this scenario, we vacate at this time the trial court's determination (and the court of appeals' subsequent affirmance) that Mangan is individually immune. We view the lower courts' decisions on this issue as premature. We stress that, upon remand, Mangan's personal immunity is an open question, at this time neither established nor foreclosed. We additionally emphasize that our holding that the Society is not immune is solely on that question of law, and should not be read as having any bearing on the resolution of the merits of the claims of any party.

**{¶ 49}** In conclusion, the judgment of the court of appeals that the Society is immune from suit is reversed, and this cause is remanded to the trial court for further proceedings.

*Judgment reversed*
*and cause remanded.*

F.E. SWEENEY, J., concurs.

DOUGLAS and PFEIFER, JJ., concur in the syllabus and judgment.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

_____

**DOUGLAS, J., concurring.**

{¶ 50} I concur with the syllabus and judgment of the majority. While I do so, I continue to adhere to my dissent in *Gladon v. Greater Cleveland Regional Transit Auth.* (1996), 75 Ohio St.3d 312, 323, 662 N.E.2d 287, 296.

PFEIFER, J., concurs in the foregoing concurring opinion.

_____

**COOK, J., dissenting.**

{¶ 51} I agree with the majority's conclusion that the Agricultural Society is a political subdivision, but I dissent from the holding that the Society activities pertinent to this case are proprietary rather than governmental.

{¶ 52} The majority states that the important question here is not whether the holding of the county fair is a governmental function, but whether the holding of a hog show at the county fair and the subsequent investigation into allegations of wrongdoing associated with that hog show were governmental functions. First, I see no basis for distinguishing the county fair from a hog show held as a part of the fair. The majority approvingly reviews a 1988 Attorney General opinion in which the Attorney General determined that a county agricultural society is a political subdivision because its main purpose is education. 1988 Ohio Atty.Gen.Ops. No. 88-034. If the promotion of educational goals of a county fair is a governmental function and renders a county agricultural society a political subdivision, how can a livestock competition held as part of the fair, serving the same kinds of educational purposes as does the fair and conducted by the same entity that holds the fair, be distinguished from the fair as a whole for purposes of governmental immunity? What happens at a county agricultural fair that makes it educational, if not agricultural exhibits, demonstrations, events, and contests? It seems to me that a livestock competition is an important part of what makes the holding of the fair itself a governmental function. For our purposes here, then, we

17

must view the hog competition as part and parcel of the fair itself.  I would hold, therefore, that the hog show is a governmental function.

{¶ 53} The majority attempts to support its holding that the hog show is a proprietary function by asserting that "[a]ny organization, whether private or public, can hold a competition of this type."  The test, however, is not whether a nongovernmental person (or entity) *can* conduct the activity in question.  Rather, it is whether the activity *is*, in fact, "*customarily engaged in* by nongovernmental persons."  (Emphasis added.)  R.C. 2744.01(C)(1)(c).  The majority concedes that "many such competitions are conducted within county fairs."  County agricultural fairs could conceivably be held by private, nongovernmental organizations.  The fact appears to be, though, that they are *not*, and that is a critical difference under the statute.

{¶ 54} The majority goes on to state that "[t]he consideration that many such competitions are conducted within county fairs cannot change the fact that there is nothing inherently governmental about them."  While it is true that the fact that an event takes place within a county fair does not automatically render it a governmental function, the evidence here is that "such competitions" are customarily conducted by county fairs.  And whether an activity is "inherently governmental" is not the test.

{¶ 55} Finally, the majority concludes that there is "no reason to distinguish a livestock competition at a county fair from any other similar competition, such as a livestock competition held elsewhere than at a county fair, or a dog or cat show, or an art show, or a chili cook-off, or a beauty pageant, or a car show."  But a livestock competition held elsewhere might still be a governmental function, or it might not, depending on who was conducting it and what the purposes of the show were.  And dog or cat shows, chili cook-offs, beauty pageants, and car shows, aside from the fact that their primary purposes are less likely to be educational and more likely to be commercial, entertainment-oriented, or otherwise private, *are*

customarily held by nongovernmental persons.  There is good reason to distinguish between the hog show at issue here and the other kinds of shows and contests mentioned by the majority.

{¶ 56} Because I would hold the county fair livestock competition to be a governmental function, I would affirm the judgment of the court of appeals that the Society is immune from liability in this case.  I therefore respectfully dissent.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing dissenting opinion.

—————————————