[Cite as *McDonald v. Lacy*, 2018-Ohio-2753.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| MITCHELL F. MCDONALD | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 27779 |
| | : | |
| v. | : | Trial Court Case No. 16-CV-2106 |
| | : | |
| PAUL W. LACY, et al. | : | (Civil Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 13th day of July, 2018.

. . . . . . . . . .

THOMAS J. INTILI, Atty. Reg. No. 0036843, 2300 Far Hills Avenue, Dayton, Ohio 45419
       Attorney for Plaintiff-Appellant

LAWRENCE J. GREGER, Atty. Reg. No. 002592, 120 W. Second Street, Suite 1100, Dayton, Ohio 45402
       Attorney for Plaintiff-Appellant

JEFFREY C. TURNER, Atty. Reg. No. 0063154, DAWN M. FRICK, Atty. Reg. No. 0069068, and CHRISTOPHER T. HERMAN, Atty. Reg. No. 0076894, 8163 Old Yankee Street, Suite C, Dayton, Ohio 45458
       Attorneys for Defendants-Appellees

. . . . . . . . . . . .

HALL, J.

{¶ 1} Plaintiff-Appellant, Mitchell McDonald, appeals the trial court's entry of summary judgment for Defendants-Appellees City of Riverside and Mitchell Miller.

## I. Background

{¶ 2} In November 2004, the City of Riverside embarked on the "Entryway Enhancement Project." The project involved erecting signs and monuments at several entrances to the city. Funding for the project came from a federal grant and a grant from the Montgomery County Development Office. In its application for the county grant, Riverside described the project this way:

> The Entryway Beautification project will help improve roadway safety and minor drainage problems, as well as aesthetically enhance the entrances to the city along Valley Pike (Avondale Subdivision) and along the Harshman Road/Woodman Drive corridor (Woodman Drive/US 35 Corridor). Roadway and drainage improvements will be made and additional enhancements will be provided via entrance signage, lighting and landscaping. The proposed improvements will for the most part be constructed within the existing right-of-way.

{¶ 3} Riverside hired LJB, Inc. to provide design, landscaping, and civil engineering services. LJB in turn hired Envision-Works, Inc., to design the entryways' monuments and signage. Riverside agreed to work with the Ohio Department of Transportation (ODOT) to complete the project, and it was ODOT which chose the construction company that would actually do the work. Construction began in July 2009 and ended the following November. Mitchell Miller was the city's service director,

responsible for the city's operations, personnel, and construction projects. He oversaw the Entryway Enhancement Project for the city.

{¶ 4} One of the locations where a sign and monument went up was on Woodman Drive. A center-of-the-roadway left-turn lane was converted to a curbed median in which a sign and monument were constructed. A year after the Woodman median was installed, in December 2010, a motorist lost control of her car, veered into the median, and hit the monument and sign, sending debris from the monument across Woodman Drive. Riverside repaired the monument and sign and restored the landscaping in the median. Miller oversaw the restoration.

{¶ 5} Several years later, in May 2014, Paul Lacy, driving northbound on Woodman Drive, lost control of his truck, veered into the median, and collided with the monument and sign, sending debris across the southbound lanes of Woodman Drive. In an unfortunate coincidence of timing, McDonald happened to be riding his motorcycle in a southbound lane and was struck by pieces of debris. He was thrown to the pavement and suffered serious, permanent injuries. Riverside subsequently removed the Woodman median, restoring the original left-turn lane.

{¶ 6} In April 2016, McDonald filed a complaint for personal injuries, permanent disability, lost income, and loss of services against Lacy, LJB, Envision-Works, Riverside, and Miller. Against Lacy, LJB, and Envision-Works, he asserted claims for negligence; he asserted claims for political subdivision tort liability against Riverside and political-subdivision employee tort liability against Miller. Riverside and Miller moved for summary judgment based on political-subdivision immunity under R.C. Chapter 2744. The trial court agreed that both defendants were immune from liability. The court sustained their

summary-judgment motion and dismissed McDonald's claims against them.

**{¶ 7}** McDonald appealed.[1]

## II. Analysis

**{¶ 8}** McDonald assigns two errors to the trial court. The first argues that the court erred by entering summary judgment for Riverside, and the second argues that the court erred by entering summary judgment for Miller.

**{¶ 9}** "Whether a party is entitled to immunity is a question of law properly determined by the court prior to trial pursuant to a motion for summary judgment." (Citations omitted.) *Pelletier v. Campbell*, 2018-Ohio-2121, __N.E.3d__, ¶ 12. An appellate court reviews a summary judgment related to the applicability of governmental immunity de novo, and its review is governed by the summary-judgment standard set forth in Civ.R. 56. *Id.* at ¶ 13.

**{¶ 10}** "Summary judgment may be granted when '(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.' " (Brackets sic.) *M.H. v. Cuyahoga Falls*, 134 Ohio St.3d 65, 2012-Ohio-5336, 979 N.E.2d 1261, ¶ 12, quoting *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364

---

[1] Civ.R. 54(B) language is absent from the trial court's summary-judgment entry. After summary judgment was entered, McDonald voluntarily dismissed defendants Lacy, LJB, and Envision-Works. Subsequently, on September 21, 2017, the trial court entered an order dismissing the case. The entry states that a settlement agreement was reached among the parties, though it does not say which parties. It is from this dismissal order that McDonald appealed.

N.E.2d 267 (1977).

## A. Immunity of a political subdivision

{¶ 11} The first assignment of error states:

THE TRIAL COURT ERRED BY ENTERING SUMMARY JUDGMENT FOR DEFENDANT-APPELLEE THE CITY OF RIVERSIDE.

{¶ 12} A tripartite analysis is used to determine whether a political subdivision is immune from tort liability under R.C. Chapter 2744:

R.C. Chapter 2744 sets out the method of analysis, which can be viewed as involving three tiers, for determining a political subdivision's immunity from liability. First, R.C. 2744.02(A)(1) sets out a general rule that political subdivisions are not liable in damages. In setting out this rule, R.C. 2744.02(A)(1) classifies the functions of political subdivisions into governmental and proprietary functions and states that the general rule of immunity is not absolute, but is limited by the provisions of R.C. 2744.02(B), which details when a political subdivision is not immune. Thus, the relevant point of analysis (the second tier) then becomes whether any of the exceptions in R.C. 2744.02(B) apply. Furthermore, if any of R.C. 2744.02(B)'s exceptions are found to apply, a consideration of the application of R.C. 2744.03 becomes relevant, as the third tier of analysis.

*Greene Cty. Agricultural Soc. v. Liming*, 89 Ohio St.3d 551, 556-557, 733 N.E.2d 1141 (2000), citing *Cater v. Cleveland*, 83 Ohio St.3d 24, 28, 697 N.E.2d 610 (1998).

{¶ 13} The exception that potentially applies in this case is R.C. 2744.02(B)(2), which subjects a political subdivision to liability for injury "caused by the negligent

performance of acts by their employees with respect to proprietary functions of the political subdivision[ ]." McDonald contends that Riverside was engaged in proprietary functions when it built the Woodman median, so the city is not immune. Riverside, conversely, maintains that the function was governmental, like the trial court concluded, rendering the city immune.

{¶ 14} Political-subdivision functions are divided into the mutually exclusive categories of governmental and proprietary, both of which are statutorily defined. R.C. 2744.01(C)(1) defines "governmental function" as any of the following:

(a) A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;

(b) A function that is for the common good of all citizens of the state;

(c) A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; and that is not specified in division (G)(2) of this section as a proprietary function.

R.C. 2744.01(C)(2) lists specific functions that are expressly designated as governmental, including "[t]he regulation of the use of, and the maintenance and repair of, roads, highways, streets, avenues, alleys, sidewalks, bridges, aqueducts, viaducts, and public grounds," R.C. 2744.01(C)(2)(e), and "[t]he provision or nonprovision, planning or design, construction, or reconstruction of a public improvement * * *," R.C. 2744.01(C)(2)(l). To satisfy the definition of "proprietary function" in R.C. 2744.01(G)(1), on the other hand, two elements must be satisfied:

(a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2) of this section;

(b) The function is one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons.

R.C. 2744.01(G)(2) lists specific functions that are expressly designated as proprietary, which include operating a hospital, maintaining or operating a utility or sewer system, and operating and controlling things like a stadium, an auditorium, an exhibition hall, or an off-street parking facility.

{¶ 15} Here, the activities that allegedly caused McDonald's injuries were related to the construction of the Woodman median, which included the design and construction of the monument and sign. These activities did not clearly fall within the specific functions that are expressly designated in R.C. 2744.01(C)(2) or 2744.01(G)(2), so we must look to the general definitions in R.C. 2744.01(C)(1) and 2744.01(G)(1). The function at issue here plainly was not one "imposed upon the state as an obligation of sovereignty," R.C. 2744.01(C)(1)(a). Nor do we think that the function was "for the common good of all citizens of the state," R.C. 2744.01(C)(1)(b). For some citizens, yes, but not for all. There is little dispute that the function at issue "promotes or preserves the public peace, health, safety, or welfare," R.C. 2744.01(C)(1)(c) and 2744.01(G)(1)(b). The key question here is whether the function involves activities that "are not engaged in or not customarily engaged in by nongovernmental persons," R.C. 2744.01(C)(1)(c), or involves activities that "are customarily engaged in by nongovernmental persons," R.C. 2744.01(G)(1)(b).

{¶ 16} The activities involved in the construction of the Woodman roadway median

were part of the city's Entryway Enhancement Project, the purpose of which was to beautify the city, delineate city limits, fix drainage problems, and improve roadway safety. We believe that this overarching project was a governmental function. McDonald tacitly concedes this in his brief. But he argues that the activities of constructing the monument and erecting the sign made the function proprietary because nongovernmental persons customarily engage in those activities. McDonald cites *Greene Cty. Agricultural Soc. v. Liming*, 89 Ohio St.3d 551, 733 N.E.2d 1141, for the proposition that the focus must be on the city's specific activities, not the broader context in which the activities occurred.

{¶ 17} In our opinion, *Liming* has limited value in this case. The Court in *Liming* concluded that a county agricultural society that conducted a hog competition at a county fair and a subsequent investigation into one of the contest entrants was engaged in a proprietary function. The Court noted that "the issue here is not whether holding a county fair is a governmental function; rather, it is the more specific question of whether conducting the hog show at the county fair and conducting the investigation into the allegations of irregularity surrounding the entry of Big Fat in that hog show are governmental functions." *Liming* at 560. But the analysis in the Court's lead opinion was affected by the fact that county agricultural societies are not specifically mentioned in the statutory definition of "political subdivision." "In a situation such as the present case," said the lead opinion, "when the political subdivision at issue is not one of the bodies specifically mentioned within R.C. 2744.01(F), the exceptions to immunity of R.C. 2744.02(B) should be construed in a way that leads to a finding of immunity for only the central core functions of the political subdivision." *Id*. This analytical framework suggests that the exceptions may be construed more broadly to allow immunity for bodies that *are*

specifically mentioned in the statute, like municipal corporations. Furthermore, unlike conducting a hog show, the Entryway Enhancement Project here is close to several of the functions specifically listed in the statutory definition of "governmental function," like the maintenance and repair of "roads, highways, streets, avenues, * * * and public grounds," R.C. 2744.01(C)(2)(e), and "[t]he provision or nonprovision, planning or design, construction, or reconstruction of a public improvement * * *," R.C. 2744.01(C)(2)(l). The value of *Liming* is also limited by the positions of the justices. Only the author, Justice Resnick, and Justice Sweeney concurred in the language of the lead opinion. Justices Douglas and Pfeifer concurred only with the syllabus and judgment. The relevant portion of the syllabus, paragraph two, states "The conducting of a livestock competition at a county fair by a county agricultural society is a proprietary function pursuant to R.C. Chapter 2744." The other three justices dissented. Accordingly, only the syllabus, without textual analysis, constitutes the holding of the court, and that syllabus has little connection with a roadway improvement and beautification project.

{¶ 18} Furthermore, we have held that an activity that is customarily performed by nongovernmental persons does not render proprietary an overarching function that is governmental. In *Shank v. Springfield*, 2d Dist. Clark No. 94-CA-71, 1995 WL 259188 (May 3, 1995), we concluded that the construction of driveway aprons as part of a road reconstruction and maintenance project by the city was a governmental function, even though installation of a driveway apron was an activity that is usually performed by a nongovernmental person. "Although it may be true," we said, "that the construction of a driveway apron is an activity that is customarily engaged in by non-governmental persons, in this case the driveway aprons were constructed as part of the Columbus Avenue

maintenance and reconstruction project and were, therefore, constructed by the City pursuant to the performance of its governmental function." *Shank* at *8. Similarly, in *Hortman v. Miamisburg*, 161 Ohio App.3d 559, 2005-Ohio-2862, 831 N.E.2d 467 (2d Dist.), *reversed on other grounds*, 110 Ohio St.3d 194, 2006-Ohio-4251, 852 N.E.2d 716, we concluded that the building of a wall and the removal of trees were governmental functions because the activities were performed as part of the city's road-improvement project. "Although such activities are often performed by nongovernmental persons," we said, "they cannot be divorced from the underlying governmental function, i.e., the repair and maintenance of Maue Road." *Hortman* at ¶ 20. Indeed, we distinguished *Liming*, saying that "[i]n this respect, the present circumstances are distinguishable from *Liming*, where the livestock competition was neither a 'central core function' of the county agricultural society nor essential to the county fair." *Id.*

{¶ 19} Here, the construction (and reconstruction) of the Woodman median was part of the city's Entryway Enhancement Project, which was a governmental function. So the activities connected with that project must be considered in that context.

{¶ 20} McDonald also tries to frame the function at issue as new road construction and argues that that is a proprietary function, citing in support *Kenko Corp. v. City of Cincinnati*, 183 Ohio App.3d 583, 2009-Ohio-4189, 917 N.E.2d 888 (1st Dist.). But even if the project is properly considered road construction, *Kenko* does not say that that is a proprietary function. Rather, the *Kenko* court determined that the city was engaged in more than just building a road, that it was actually planning and designing a subdivision. Since the road construction was connected with the overarching function of subdivision development, which is something that nongovernmental persons customarily do, the

appellate court concluded that the function at issue was proprietary. *Kenko* at ¶ 30. Thus *Kenko* is in line with our analysis in *Shank* and *Hortman* and supports our analysis here that Riverside's activities must be considered in the context of the Entryway Enhancement Project.

{¶ 21} McDonald also argues that the monument and sign were specific to the Woodman median's landscaping, not to traffic control, drainage, topography, or curbing. And the purpose of the entryway signage, he says, was to provide the city with a sense of identity and community pride and to improve property values through beautification. McDonald says that there is nothing uniquely governmental about identity, community pride, or beautification. Again, we do not believe that the specific activities involved in the Entryway Enhancement Project should be divorced from that larger function and examined in isolation.

{¶ 22} McDonald's injuries, even if caused by negligence by the city, were not the result of performance of a proprietary function. Consequently Riverside is entitled to immunity under R.C. 2744.02(A) and to summary judgment.

{¶ 23} The first assignment of error is overruled.

### B. Immunity of a political-subdivision employee

{¶ 24} The second assignment of error states:

THE TRIAL COURT ERRED BY ENTERING SUMMARY JUDGMENT FOR DEFENDANT-APPELLEE MITCHELL E. MILLER.

{¶ 25} Miller, as Riverside's employee, is a political-subdivision employee, and McDonald sued him in that capacity. R.C. 2744.03(A) "prescribes defenses or immunities that an employee of a political subdivision may assert to establish nonliability in a civil

action for damages allegedly caused by an act or omission in connection with a governmental or proprietary function." *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161, ¶ 7. As relevant here, an employee of a political subdivision is immune from liability unless the employee's acts or omissions were "with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 2744.03(A)(6)(b). McDonald argues that Miller's conduct was wanton or reckless.

{¶ 26} The Ohio Supreme Court has defined "wanton misconduct" as " 'the failure to exercise *any* care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result.' " (Emphasis sic.) *Argabrite* at ¶ 8, quoting *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, paragraph three of the syllabus. And the Court has defined "reckless conduct" as "conduct 'characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.' " *Id.*, quoting *Anderson* at paragraph four of the syllabus. "Recklessness requires knowledge by the actor that his 'conduct will in all probability result in injury.' " *Id.*, quoting *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, paragraph three of the syllabus. "These are rigorous standards," the Court has said, "that will in most circumstances be difficult to establish * * *." *Id.*

{¶ 27} We agree with the trial court that there is no evidence that Miller's conduct in connection with the construction or reconstruction of the Woodman median was wanton or reckless. There is no evidence that Miller failed to exercise any care toward those to whom a duty of care was owed in circumstances in which there was great probability that harm would result. There is no evidence that Miller consciously disregarded or was

indifferent to a known or obvious risk of harm that was unreasonable. And there is no evidence that Miller knew that someone would be injured.

{¶ 28} McDonald points out that Miller knew that debris from the first collision landed in Woodman Drive's southbound travel lanes and that Miller knew that the curbing around the median did not prevent the collision. McDonald says that, after the first accident, Miller did not request that the monument and sign be relocated, did not consult LJB about how to prevent future accidents, and did not approach the city about what should be done. But none of this amounts to wantonness or recklessness. Knowing that a motorist hit the sign and monument on one occasion did not make it reckless to leave the sign and monument in the median. Nothing about this suggests an unreasonable risk of harm. It does not make it such that Miller should have known that leaving the sign and monument would in all probability result in injury. There certainly was a risk of harm, a risk that another motorist could hit the sign and monument, but there was no evidence that the risk was unreasonable. At worst, all this might make Miller negligent.

{¶ 29} McDonald submitted an affidavit from his civil engineering expert, Paul Dorothy. Dorothy stated in his affidavit that "[t]he property and bodily injury risks of designing and erecting the Woodman median monument and sign were, or should have been, foreseeable to an ordinary and reasonable person." (Affidavit of Paul Dorothy, ¶ 10g). He further stated that "[t]he City's and Miller's 2011 repair of the Woodman median monument and sign manifested a conscious disregard of, or indifference to, a known and obvious risk to others under circumstances where there was great probability that substantial harm would result." (*Id.* at ¶ 10h). But these averments are essentially just statements of law, "improper legal conclusion[s] that should not be submitted in affidavits

used to show genuine issues of material fact." *Seege v. Smith*, 2d Dist. Montgomery No. 26210, 2014-Ohio-5450, ¶ 34. Furthermore, just because a plaintiff's expert says that the defendant was reckless " 'does not mean that there is a genuine issue for trial as to whether the defendant lost her immunity due to recklessness.' " *Id.* at ¶ 35, quoting *Fediaczko v. Mahoning Cty. Children Servs.*, 7th Dist. Mahoning No. 11 MA 186, 2012-Ohio-6090, ¶ 31.

{¶ 30} Summary judgment is appropriate if " 'the individual's conduct does not demonstrate a disposition to perversity.' " *Lindsey v. Summit Cty. Children Servs. Bd.*, 9th Dist. Summit No. 24352, 2009-Ohio-2457, ¶ 19, quoting *Fields v. Talawanda Bd. of Edn.*, 12th Dist. Butler No. CA2008-02-035, 2009-Ohio-431, ¶ 16. *Accord Seege* at ¶ 35 (quoting the same). The record here does not show that Miller had a perverse disposition or that he consciously disregarded a risk to others. We conclude that the trial court was correct in determining that Miller was entitled to immunity and to summary judgment.

{¶ 31} The second assignment of error is overruled.

### III. Conclusion

{¶ 32} We have overruled both of the assignments of error presented. The trial court's judgment is affirmed.

. . . . . . . . . . . .

WELBAUM, P. J., and TUCKER, J., concur.

Copies mailed to:

Thomas J. Intili
Lawrence J. Greger
Jeffrey C. Turner
Dawn M. Frick
Christopher T. Herman
Kevin C. Connell
Christopher C. Hollon
Zachary S. Heck
David M. Rickert
Hon. Mary Katherine Huffman