OPINION
{¶ 1} Plaintiff-appellant Tina M. Henry, Administrator of the Estate of Gary Glenn Henry III, deceased, appeals the July 5, 2006 Judgment Entry of the Delaware County Court of Common Pleas granting summary judgment in favor of defendant-appellee Delaware County Commissioners and denying her motion for summary judgment.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On August 2, 2003, Gary Glenn Henry III drove his Chevrolet S-10 pickup truck to Jeremy Taynor's house. Henry had recently passed his driver's test, and received the vehicle as a gift for his eighteenth birthday.
 {¶ 3} While at Taynor's house, Henry mentioned he needed gas in his truck, and Taynor offered to accompany Henry to the gas station as Henry did not know how to get there. Taynor told Henry how to get to the gas station, and they left at approximately ten o'clock in the evening.
 {¶ 4} At deposition, Taynor testified there was no lighting on the roads, but Henry did not have difficulty getting to the gas station. They did not take note of any special signs along the way, nor did they encounter any signs in their direct path of travel.
 {¶ 5} After leaving the gas station, they proceeded back to the Taynor residence. Taynor testified at deposition, Henry was driving approximately 35-45 miles per hour and was under control. After turning onto Ostrander Road, Henry engaged in a brief cell phone call with his girlfriend. After terminating the conversation, the vehicle *Page 3 
approached a curve at the intersection of Ostrander and Fontanelle Roads, traveling approximately 44 miles per hour.
 {¶ 6} According to Taynor's testimony, as the vehicle rounded the curve, a barricade came into view of the pickup's headlights to the right, appearing to block the lane of travel. Both he and Henry yelled "Sign!" at which point Henry attempted to steer to the left of the sign. As he steered into the southbound lane, the road veered sharply to the right. The vehicle traveled off the road and collided with a tree. Henry was killed instantly.
 {¶ 7} Ostrander Road is a two lane, county road with a speed limit of fifty-five miles per hour, with an advisory speed of thirty miles per hour on the curve at which the accident occurred.
 {¶ 8} At the time of the accident, the Delaware County Engineer's Office was engaged in the process of replacing a culvert bridge, requiring the county to close Ostrander Road one and one-quarter miles past Fontanelle Road.
 {¶ 9} The county erected a "Road Closed 1 ¼ Miles Ahead, Local Traffic Only/Detour" sign in the right-of-way of Ostrander Road. The sign was positioned in the northbound lane of travel, stretching from the yellow line at the right side of the roadway, almost to the center of Ostrander Road.
 {¶ 10} Due to the road closing, the Engineer's Office had created a detour design plan. Specifically, Robert Riley, an intern with the Engineer's Office, created the detour design plan relying primarily on the Ohio Manual of Uniform Traffic Devices ("Manual"). The Deputy Design Engineer, Ryan Mraz, Mr. Riley's supervisor, reviewed the detour *Page 4 
design plan created by Riley, as did the Deputy Development Engineer and the Delaware County Engineer. The detour plan was ultimately approved by appellee.
 {¶ 11} The detour routes were marked by several signs along the detour route. The Specialty Crew from the Engineer's Office erected the detour route signs on July 24, 2003. The crew placed warning signs on Ostrander Road between S.R. 36 and Fontanelle Road to mark the secondary detour. These signs included: 1) a "Road Closed 2 miles ahead, Local Traffic Only/Detour" sign, located just north of S.R. 36 on Ostrander Road, placed in the northbound lane of traffic on the right hand side of the road; 2) a "Road Closed Ahead" sign, located on the right side of the road, approximately 600 feet south of where Fontanelle Road intersects with Ostrander Road; 3) a "Detour Ahead" sign, located on the right side of the road, approximately 200 feet south of where Fontanelle intersects with Ostrander Road; and, 4) the sign at issue.
 {¶ 12} Appellant initiated this action seeking damages against the Delaware County Commissioners alleging negligence in the placement of the sign at issue on Ostrander Road.
 {¶ 13} On January 13, 2005, appellee filed a motion for summary judgment. Appellant filed an amended complaint on January 27, 2006, alleging R.C. 2744.01 et seq. violates the right to a trial by jury and a remedy under the Ohio Constitution. Appellee filed an amended answer on January 10, 2006. Appellant filed a motion for summary judgment and a memorandum contra appellee's motion for summary judgment on January 30, 2006. Via Judgment Entry of July 5, 2006, the trial court granted summary judgment in favor of appellee and denied appellant's motion for summary judgment. *Page 5 
 {¶ 14} Appellant now appeals, assigning as error:
 {¶ 15} "I. THE TRIAL COURT FAILED TO FOLLOW THE REQUIREMENTS OF CIVIL RULE 56 IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DELAWARE COUNTY.
 {¶ 16} "II. THE TRIAL COURT INCORRECTLY DETERMINED AS A MATTER OF LAW THAT THE COUNTY DID NOT VIOLATE MANDATORY PROVISIONS OF THE OHIO MANUAL OF UNIFORM TRAFFIC DEVICES.
 {¶ 17} "III. THE TRIAL COURT INCORRECTLY HELD THAT THE COUNTY WAS IMMUNE FROM SUIT UNDER R.C. 2744.02.
 {¶ 18} "IV. THE TRIAL COURT ERRED BY FAILING TO DECLARE CHAPTER 2744 OF THE OHIO REVISED CODE UNCONSTITUTIONAL."
 {¶ 19} Our standard of review is de novo, and as an appellate court, we must stand in the shoes of the trial court and review summary judgments on the same standard and evidence as the trial court.Smiddy v. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35. Accordingly, an appellate court must independently review the record to determine whether summary judgment was appropriate, and we need not defer to the trial court's decision. See Brown v. Scioto Bd. of Commrs. (1993),87 Ohio App.3d 704, 711; Morehead v. Conley (1991), 75 Ohio App.3d 409,411-412.
 {¶ 20} Civ.R. 56(C) provides:
 {¶ 21} "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to *Page 6 
judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only [therefrom], that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in the party's favor."
 {¶ 22} Pursuant to the above rule, a trial court may not enter summary judgment if it appears a material fact is genuinely disputed. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The moving party may not make a conclusory assertion that the nonmoving party has no evidence to prove its case. The moving party must specifically point to some evidence that demonstrates that the nonmoving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the nonmoving party to set forth specific facts demonstrating that there is a genuine issue of material fact for trial. Vahila v. Hall, 77 Ohio St.3d 421, 429, 1997-Ohio-259, citing Dresher v. Burt, 75 Ohio St.3d 280, 293, 1996-Ohio-107.
 {¶ 23} It is based upon this standard we review appellant's assignments of error.
 I, II, III and IV {¶ 24} All four of appellant's assignments of error raise common and interrelated issues; therefore, we will address the arguments together.
 {¶ 25} Appellant asserts the trial court erred in failing to declare Ohio Revised Code Chapter 2744 unconstitutional. *Page 7 
 {¶ 26} In Eischen v. Stark County Bd. Of Comm., this Court addressed the constitutionality of Chapter 2744, stating:
 {¶ 27} "Despite the provocative language used by Justice Douglas inButler, the law of Ohio remains that R.C. Chapter 2744 is constitutional. The Supreme Court of Ohio addressed this issue inFabrey v. McDonald Police Department, 70 Ohio St.3d 351, 639 N.E.2d 31,1994-Ohio-368, and Fahnbulleh v. Straham, 73 Ohio St.3d 666,653 N.E.2d 1186, 1995-Ohio-295."
 {¶ 28} Accordingly, based on our prior decision in Eischen, supra, and controlling Ohio case law, we conclude R.C. Chapter 2744 is constitutional and overrule appellant's fourth assignment of error.
 {¶ 29} R.C. Section 2744.02(A)(1) states:
 {¶ 30} "(A)(1) For the purposes of this chapter, the functions of political subdivisions are hereby classified as governmental functions and proprietary functions. Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."
 {¶ 31} Determining whether a political subdivision is immune from tort liability pursuant to R.C. Chapter 2744 involves a three-tiered analysis. Greene Cty. Agricultural Soc. v. Liming (2000),89 Ohio St.3d 551, 556-557, 733 N.E.2d 1141. "The first tier is the general rule that a political subdivision is immune from liability incurred in performing either a governmental function or proprietary function. Id. at 556-557,733 N.E.2d 1141; *Page 8 
R.C. 2744.02(A)(1). However, that immunity is not absolute. R.C.2744.02(B); Cater v. Cleveland (1998), 83 Ohio St.3d 24, 28,697 N.E.2d 610.
 {¶ 32} "The second tier of the analysis requires a court to determine whether any of the five exceptions to immunity listed in R.C. 2744.02(B) apply to expose the political subdivision to liability. Id. at 28,697 N.E.2d 610. At this tier, the court may also need to determine whether specific defenses to liability for negligent operation of a motor vehicle listed in R.C. 2744.02(B)(1)(a) through (c) apply.
 {¶ 33} "If any of the exceptions to immunity in R.C. 2744.02(B) do apply and no defense in that section protects the political subdivision from liability, then the third tier of the analysis requires a court to determine whether any of the defenses in R.C. 2744.03 apply, thereby providing the political subdivision a defense against liability."
 {¶ 34} Colbert v. Cleveland (2002), 99 Ohio St.3d 215, 216.
 {¶ 35} Revised Code Section 2744.03(A) provides, in pertinent part:
 {¶ 36} "(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:
 {¶ 37} * * *
 {¶ 38} "(2) The political subdivision is immune from liability if the conduct of the employee involved, other than negligent conduct, that gave rise to the claim of liability was required by law or authorized by law, or if the conduct of the employee involved *Page 9 
that gave rise to the claim of liability was necessary or essential to the exercise of powers of the political subdivision or employee.
 {¶ 39} "(3) The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee."
 {¶ 40} R.C. § 2744.03
 {¶ 41} Appellant argues the trial court erred in granting summary judgment in favor of appellee. Appellant asserts the trial court was inconsistent in holding both the county was bound by the mandatory provisions of the Ohio Manual of Uniform Traffic Control Devices ("Manual"), and the county had broad discretion with regard to the mandatory provisions therein.
 {¶ 42} Appellant maintains the sign at issue was an obstruction in the traveled portion of the roadway, and appellees were responsible to remove the sign. However, there is no dispute the sign at issue is a mandatory sign required under the Manual. Although the sign at issue may literally be an obstruction in the common and ordinary sense of that word; if the sign is placed in accordance with the mandatory requirements of the traffic manual, the sign is not legally an obstruction.
 {¶ 43} In Franks v. Lopez (1994), 106 Ohio app.3d 440, the Ohio Supreme Court found the "failure to maintain signage already in place may constitute an actionable nuisance claim." *Page 10 
 {¶ 44} In Jones v. Shelly Co. (1995), 106 Ohio App.3d 440, this Court held the county's improper placement of construction signs in violation of mandatory language of the Manual, "may give rise to an actionable nuisance claim under R.C. 2744.02(B)(3)."
 {¶ 45} Appellant cites Section 7B-5 of the Manual, which states, in pertinent part:
 {¶ 46} "Signs shall be placed in positions where they will convey their messages most effectively and placement must therefore be accommodated to highway design and alignment. Signs shall be placed so that the driver will have adequate time for response."
 {¶ 47} "As a general rule signs should be located on the right-hand side of the roadway. Where special emphasis is deemed necessary, dual installations may be made which consist of duplicate signs opposite each other on the left and right sides of the roadway.
 {¶ 48} Section 7C-5 of the Manual, states:
 {¶ 49} "One of these signs shall be used at the point where through traffic must detour to avoid a closing of the highway at a construction or maintenance projected located beyond the point of detour. It should be erected in the center of the roadway on a Type III barricade, or as an acceptable alternative, at the right of the roadway where the pavement is narrow."
 {¶ 50} "Shall" provisions of the Manual are mandatory, whereas "may" provisions of the Manual are discretionary. Dorrian v. SciotoConservancy Dist. (1971), 27 Ohio St.2d 102. "[T]he word "shall" shall be construed as mandatory unless there appears a clear and unequivocal legislative intent that [it] receive a construction other than [its] ordinary usage.'" (Brackets sic.) Ohio Civil Rights Comm. v. CountrywideHome Loans, *Page 11 Inc., 99 Ohio St.3d 522, 2003-Ohio-4358, 794 N.E.2d 56, ¶ 4, quotingDorrian v. Scioto Conservancy Dist. (1971), 27 Ohio St.2d 102,56 O.O.2d 58, 271 N.E.2d 834, paragraph one of the syllabus.
 {¶ 51} We now turn our attention to the Manual provisions set forth above. The Manual provides the sign shall be placed at the point where through traffic must detour, either in the center of the roadway, or, as an acceptable alternative, at the right of the roadway where the pavement is narrow. While the engineer's office is required to place a sign, discretion is afforded in determining which alternative is appropriate. The Manual further requires the signs be placed where they will convey their messages most effectively and provide adequate time for response, which provisions impose mandatory, not discretionary, results. Accordingly, appellees were mandatorily required to place a sign at the point where through traffic must detour which conveyed the message most effectively and provided adequate response time, with the discretion as to whether to place the sign on the right side or in the center.
 {¶ 52} Appellant asserts the sign was not placed in a position to convey the message most effectively, did not take into consideration the highway design and alignment in the placement of the sign, and did not allow adequate response time, as required by the Manual. In support, appellant cites expert testimony offered to demonstrate the placement of the sign in question violated the mandatory provisions of the manual. Specifically, appellant cites the deposition testimony of Allan Kundtz and Ricky Stansifer, engineering experts.
 {¶ 53} Ricky Stansifer testified at deposition, in pertinent part: *Page 12 
 {¶ 54} "Q. And what we've been talking about is your estimates for the sight distance for Mr. Henry to the moment that he first saw the sign in question?
 {¶ 55} "A. Yes.
 {¶ 56} "Q. Which you figured to be 240 feet?
 {¶ 57} "A. Yes.
 {¶ 58} "Q. And for when he could see half the sign which you figured to be 225?
 {¶ 59} "A. Yes.
 {¶ 60} "Q. And for when he could see the bottom of the roadway so as to see the yellow line and the white edge line on Ostrander Road on the right-hand side, and you figured that to be 167 feet?
 {¶ 61} "A. Yes.
 {¶ 62} "Q. I take it then that you would intend to express an opinion at trial in this matter concerning those sight distances and those speeds and the reconstruction that you performed in this case?
 {¶ 63} "A. Yes.
 {¶ 64} "* * *
 {¶ 65} "Q. What were your observations as you drove through that night?
 {¶ 66} "A. That it's a difficult curve to deal with because of the intersection and the gap in the center lines and edge lines created by the intersection, and the brief period that you lose sight of the view over the hill crest. So you would naturally lose sight of them as you come up the little hill crest. And then the point where you would first, it would be most important for you to pick up that view again, there's a gap in them, *Page 13 
and so you have to progress a little farther before your headlights, the cast of your headlights comes back down onto the road and you see them again.
 {¶ 67} "Q. As you talked you made a motion with your hand as if going over the crest of the hill.
 {¶ 68} "A. Yes.
 {¶ 69} "Q. I'm looking at Exhibit 11 and I see a line that goes up to indicate the center line profile. I don't see it going down. Am I right?
 {¶ 70} "A. That's correct. You're still going uphill as you reach the end of the drawing, yes. You're still going uphill.
 {¶ 71} "Q. So there's no point at which there's a particular crest such that it goes back down hill from the time you leave Route 36 to the time that you reach the area of the tree? It flattens but it doesn't go back down?
 {¶ 72} "A. Right. In this region it comes up, it flattens but your general path is up, so there's a period where the case of your headlights would not light the road and in this view, notice down here this is driver's eye height above the road, and the headlights are one-third to half that height above the road. So if we looked at it right here, the headlights one-third to half this height, you can see that they are eclipsed from this point and if we had a longer straight edge — you got another hard pad of paper? If we extend that — my intent is to touch the line here. There's a point where we just get a peak of the line here, but up here, notice that the straight edge is above the road surface, so that's the eclipsing point for the headlights. The headlights cast forward but they don't actually illuminate the road surface through here. *Page 14 
 {¶ 73} "Q. Was there anything else that you observed at the scene when you went there at night?
 {¶ 74} "A. One other feature. As you're coming up the curve on the roadway, the cast of your headlights is forward, in this region. So right about the same time you're losing sight of the surface of the road because of the change in elevation, you're also illuminating basically the wrong area until you come around the curve a little bit before the case of the headlights will illuminate the actual pavement markings. So there's a point when coming up to that little crest where you're illuminating virtually nothing.
 {¶ 75} "Sometimes when you're driving at night, you'll come up a hill crest and there will be trees beyond the hill crest so you have a sense that the path you're going to follow will go between those trees. There's a tree line. In this particular case, there's no clue whatsoever.
 {¶ 76} "Q. Is that a result of the road design, including the topography that you mentioned, as well as the break in the center line and edge line?
 {¶ 77} "A. Yes. And it's also a feature of the fact that this is a farmed field here so there are no trees even to illuminate until a great distance away from the road. So there's just a period where your headlights are just shining up into sky and you're not getting any return of anything.
 {¶ 78} "* * *
 {¶ 79} "Q. Okay. I'd like to understand the individual opinions that you have in this case and talk about each of those. You have an opinion on speed that the truck at the time of the impact with the tree was going 44 miles per hour plus or minus 5 miles per hour? *Page 15 
 {¶ 80} "A. Yes.
 {¶ 81} "Q. So within a range of 39 to 40?
 {¶ 82} "A. Yes.
 {¶ 83} "* * *
 {¶ 84} "Q. I'm going to ask you some conclusory questions about things based upon what we've talked about so far. At the advisory speed of 30 miles per hour, could Mr. Henry have stopped before the tree?
 {¶ 85} "A. Yes.
 {¶ 86} "Q. And, in fact, if he had been driving at the speed on the advisory speed sign, he could have stopped completely before reaching the sign in the roadway?
 {¶ 87} "A. Yes.
 {¶ 88} "Q. If he went faster than what the sign said, the advisory speed sign, but slowed using his brake when he first saw the sign when he first was able to see the sign, he would have been able to slow down enough to drive around the sign, maneuver around it?
 {¶ 89} "A. Probably.
 {¶ 90} "Q. And if he went faster than the advisory speed sign told him to and hit the brake when he first saw the sign in the road, the sign in question, he would have been able to stop completely before he came to the tree?
 {¶ 91} "A. Yes.
 {¶ 92} "Q. The speed that you were able to estimate at the time that he hit the tree, could you have gotten a better estimate if you actually had the vehicle to look at?
 {¶ 93} "A. Probably. I would have more confidence in it, yes. *Page 16 
 {¶ 94} "Q. Do you know at what speed the truck would have had to be going as it approached the sign in order to maneuver around it safely, given that it was an S-10, a small pickup?
 {¶ 95} "A. No. It doesn't make sense to try to state it in that way. Even at the 44 he could have done it had he not been confused by the entire situation, that is, where is the road path, and then it's three points of confusion. First of all, he loses the path of the road because of the hill crest and because of the gap and because of the curve. Then when he reacquires the path of the road, we have a new problem. There's a sign in the path of the road.
 {¶ 96} "And then we have the problem of probably not illuminating the tree very effectively. If he knew that he went left of the sign, the problem is what's the safe area left of the sign? In fact, had he steered right vigorously he would have ended up out in the field with probably no harm, possibly a rollover, but he wouldn't hit the tree. But he doesn't know all of that in the 1.5 seconds that he has to consider it.
 {¶ 97} "* * *
 {¶ 98} "Q. Would it have been a very slight difference in steering that would have caused him to go left of the tree into the field without rolling over?
 {¶ 99} "A. Yes, if he knew that was an escape option, but in the darkness he didn't know what was out there.
 {¶ 100} "Q. Well, aside from that he knew or did not know, just focusing on how much he had to turn the steering wheel, would it have been a small change in steering that would have led him to the left of the tree and into the field? *Page 17 
 {¶ 101} "A. I think you are asking could a small change to the left have avoided the tree —
 {¶ 102} "Q. Yes.
 {¶ 103} "A. — in the 65 feet? And the answer is probably yes.
 {¶ 104} "Q. And a small change to the right in steering would have kept him on Ostrander Road?
 {¶ 105} "A. Yes.
 {¶ 106} "Q. And if he was, in fact, going 44 as he went by the sign, you don't' think that that was an excessive speed in an S-10 to maneuver onto the roadway. And your account of why that didn't happen I understand, but I guess what I want to know, is it your opinion that if he attempted to steer around the sign at 44 would he have caused the Chevy S-10 to tip over?
 {¶ 107} "A. If he is starting and completing the entire maneuver on the pavement, no.
 {¶ 108} "* * *
 {¶ 109} "Q. Did you have any disagreement with Dan Aerni's report that you recall?
 {¶ 110} "* * *
 {¶ 111} "A. I have reviewed it. The single ultimate conclusion is different. He concludes that the driver should have done it better, just should have driven better and been more alert.
 {¶ 112} "Q. Okay. As far as calculations, I understand — *Page 18 
 {¶ 113} "A. Well, his conclusion is it's the driver's fault because he should have driven better, been more alert for the entire trip, and made more note of everything that he saw on the way.
 {¶ 114} "Q. You don't necessarily disagree with that, but your conclusion comes out a different way?
 {¶ 115} "A. Yes. My conclusion is that with the placement of the sign, it was the principle cause of the accident."
 {¶ 116} Tr. at 15-52.
 {¶ 117} Allan Kundtz testified at deposition:
 {¶ 118} "Q. I've read the opinion that you stated and perhaps I can cut to the chase. I read your opinion in your report and I take it that you disagree with the manner in which that discretion was exercised?
 {¶ 119} "A. I don't think they adhered to the manual in terms of exercising that discretion. They did not follow the precepts of the manual in regard to the placement of that sign.
 {¶ 120} "Q. The reason that you disagree with their use of discretion is that you don't think it agrees with the precepts of the manual?
 {¶ 121} "A. In terms of the particular section that I quoted earlier, Section 7B-5 as well as section 7A-5(C) where it talks about motorists should be guided in a clear and positive manner.
 {¶ 122} "Q. Any other sections that you feel the discretion does not adhere to in the manual? *Page 19 
 {¶ 123} "A. I think I talked about them in the body of the report on Page 7. We talked about 7A-5(C), we've talked about 7B-5, and the only one that we haven't talked about is 7A-1 where, again, it talks about the safe and expeditious movement of traffic in terms of altering the driver and guiding him through the project.
 {¶ 124} "Q. Based upon your reading of the manual, you feel that their exercise and discretion in placing the sign in question was negligent?
 {¶ 125} "A. Well, I'm not going to go down that road. What I'm saying is that they, by placing the sign in question where they did, they prevented northbound drivers, such as Mr. Henry, from seeing the sign with enough time left to respond and react to the placement of that sign in the middle of the roadway — in the middle of his traveled lane, and that is contrary to the particular sections of the manual I talk about, the generalized sections of the manual that I've already quoted from.
 {¶ 126} "Q. So you don't have an opinion as to whether they were negligent or not?
 {¶ 127} "A. Well, if negligence is in the sense that they did not, that they failed to adhere to sound traffic engineering principles as embodied in the manual, then yes, they were negligent.
 {¶ 128} "Q. But you've chosen not to state your opinion in terms of negligence?
 {¶ 129} "A. They did not adhere to the manual. They violated the precepts of the manual by placing the sign where they did and that was wrong. Whether it's negligence or not, I'll leave that up to someone else to argue.
 {¶ 130} "Q. Okay. I'd like to focus on those particular sections of the manual that you rely upon to say that they have somehow violated a more general section of the *Page 20 
manual. So we start with, and you start with Section 7C-5 that says that the sign should be erected in the center of the roadway. Am I right? We start with that?
 {¶ 131} "A. It says it should be erected in the center of a roadway on a type 3 barricade or, as an acceptable alternative, at the right of the roadway —
 {¶ 132} "Q. Go ahead and finish.
 {¶ 133} "A. — when the pavement is narrow.
 {¶ 134} "Q. What's the title of Section 7C-5?
 {¶ 135} "A. Road Closed Miles Ahead Sign (R-76A, B, C and R1-101).
 {¶ 136} "Q. Is that the sign in question?
 {¶ 137} "A. Yes.
 {¶ 138} "Q. The section in the manual that deals with the sign in question then indicates that it should be erected in the center of the roadway and then talks about an acceptable alternative; is that right?
 {¶ 139} "A. That's correct.
 {¶ 140} "Q. And the acceptable alternative that's mentioned in that section is that it's at the right of the roadway when the pavement is narrow. Is that what it says?
 {¶ 141} "A. Yes.
 {¶ 142} "Q. Is the pavement narrow in this case?
 {¶ 143} "A. I don't believe so, no.
 {¶ 144} "Q. You then go to a more general section on position of signs and that's 7B-5?
 {¶ 145} "A. Yes. *Page 21 
 {¶ 146} "Q. And you rely for your opinion in that section that signs shall be placed in a position where they will convey their messagess [sic] most effectively?
 {¶ 147} "A. That's the first part, yes
 {¶ 148} "Q. And placement must, therefore, be accommodated to highway design and alignment?
 {¶ 149} "A. That's the second part.
 {¶ 150} "Q. Anything else in there?
 {¶ 151} "A. Yes. The sign shall be placed so that the driver will have adequate time for response. That's the third thing.
 {¶ 152} "Q. Okay. Is there any definition on adequate time for response in the manual?
 {¶ 153} "A. No. No. That is a traffic engineering calculation essentially that has to be done in order to properly place signs out in the field to make adjustments for real world conditions.
 {¶ 154} "Q. Is there, based upon conditions, real world conditions, is there a range of acceptable opinions on what an adequate time is?
 {¶ 155} "A. Basically you have to rely upon the speed limit that's out there and I think there's acceptable perception/reaction times that are typically used.
 {¶ 156} "Q. Okay.
 {¶ 157} "A. I know that that can vary from one and a half seconds to two and a half seconds, depending upon what you're evaluating or what you're doing.
 {¶ 158} "Q. Okay. *Page 22 
 {¶ 159} "A. But basically that is a time and distance calculation based upon speed limit.
 {¶ 160} Based upon speed limit and perception/reaction time?
 {¶ 161} "A. Yes.
 {¶ 162} "Q. Because there is a range of perception/reaction time that could be used, does that necessarily mean that there's a range of opinion on an adequate time for response?
 {¶ 163} "A. That's really an accident reconstructionist's question to answer.
 {¶ 164} "Q. Okay. That's a Rickey Stansifer question?
 {¶ 165} "A. Yes. The traffic engineering, there is one that is used for design that's typically two, two and a half seconds when you're actually designing a new roadway or redesigning an existing roadway, and that's to account for all of the various eccentricities among drivers, et cetera, and differing weather conditions. Then there's a more particular perception/reaction time that accident reconstruction people use.
 {¶ 166} "Q. Without asking you what the range is, is it within your expertise to tell me that there would be an acceptable range of opinion on what is an adequate time for response to a sign?
 {¶ 167} "A. Insofar as the application is concerned, I don't think there's a range. I think it's typically a second and a half. Again, there is different ones used for design but we're not talking about design in this case.
 {¶ 168} "Q. Okay. So you think that it's not a range. We use one and a half seconds for perception/reaction time when determining an adequate time for response?
 {¶ 169} "A. In situations like what we're dealing with here in this case, yes. *Page 23 
 {¶ 170} "Q. Let me ask you this. Do you believe that the placement of the sign in question conveyed its message effectively?
 {¶ 171} "A. Probably not because I think it was too far away from the intersection. Its message was to tell the driver that the road was closed ahead and that he was supposed to detour to the right; in other words, he was supposed to follow Fountanelle Road. I think the location of the sign in question, based upon our photogrammetry result indicates that sign was too far north of the intersection to properly convey that message.
 {¶ 172} "Q. So the sign would have been more effective if it had been dug south closer to the Fountanelle Road intersection.
 {¶ 173} If it had been placed more — if it had been placed further south closer to the Fountanelle Road intersection, It would have been better, yes.
 {¶ 174} "Q. That would have made it more effective?
 {¶ 175} "A. Yes. Also may have made it more visible to northbound traffic, but that would be a better question to ask Mr. Stansifer because he did the calculations in that regard.
 {¶ 176} "Q. Okay. The section on position of signs, the general section says as a general rule signs shall be located on the right-hand side of the roadway. Do you recognize as a general rule?
 {¶ 177} "A. Yes.
 {¶ 178} "Q. And does that general rule find an exception in the section that deals with the sign in question?
 {¶ 179} "A. Yes. *Page 24 
 {¶ 180} "Q. So the section on the sign in question states a more specific rule about sign placement than the position of sign section?
 {¶ 181} "A. Yes.
 {¶ 182} "Q. And it talks about it being, that it should be erected in the center of the roadway?
 {¶ 183} "A. Yes.
 {¶ 184} "Q. The general section on position of signs also talks about design and accommodating placement to highway design. Is the placement of the sign in question part of the design?
 {¶ 185} "A. I'm sorry. Where are you at in that section?
 {¶ 186} "Q. Section 7B-5.
 {¶ 187} "A. Whereabouts in that section?
 {¶ 188} "Q. Talks about the placement must, therefore, be accommodated to highway design and alignment.
 {¶ 189} "A. Okay. Yeah, the first paragraph, yes.
 {¶ 190} "Q. Is placement part of highway design of the sign in question?
 {¶ 191} "A. No. What it's saying is that you take into consideration the design of the highway in order to properly place the signs.
 {¶ 192} "Q. Is it fair to say that you've not calculated an adequate time for response to this sign; that that was what Mr. Stansifer did?
 {¶ 193} "A. That's correct.
 {¶ 194} "* * * *Page 25 
 {¶ 195} "Q. Yeah, restricted licenses they call it. How would you have designed this sign placement?
 {¶ 196} "A. Probably would have moved it a little bit closer to Fountanelle Road and made it dual, in other words, made it — or used two barricades, one on each side of the roadway but facing northbound traffic. That way, then, the northbound driver will be able to see and react to the sign on what would be the left-hand side of the roadway and that sign would be much more visible than just the one side on the right-hand side of the roadway, considering the geometry of the intersection or the roadway."
 {¶ 197} "Q. Is it true that the sign in question in your mind is not placed appropriately, let me start there, right?
 {¶ 198} "A. I don't believe it was placed in accordance with all of the manual dictates; that is correct.
 {¶ 199} "* * *
 {¶ 200} "Q. Let me ask you about an advisory speed sign, this advisory speed sign. Does a reasonable driver react to an advisory speed sign by slowing down?
 {¶ 201} "A. Yes.
 {¶ 202} "Q. How much sign does a driver need to see in order to react to that sign?
 {¶ 203} "A. I can't answer that question.
 {¶ 204} "Q. Okay. Is that a Rickey Stansifer question or nobody can answer the question? *Page 26 
 {¶ 205} "A. It may not even be an actual reconstructionist's question. That deals with human factors and maybe an eye expert or someone along those lines. A traffic engineer will not be able to answer that question."
 {¶ 206} Tr. at 55-65; 71-73.
 {¶ 207} Appellees' expert, Daniel Aerni, testified at deposition:
 {¶ 208} "Q. I believe you indicated earlier that as an initial recollection to the presence of the sign in question in his path of travel that attempting to steer left was a logical initial maneuver?
 {¶ 209} "A. Yes. Either that, or braking or both.
 {¶ 210} "Q. And, in fact, I believe you said earlier that would be the natural reaction, initially at least, to steer left under all the circumstances?
 {¶ 211} "A. Right. Combined with braking.
 {¶ 212} "Q. Would you agree that the sign in question was not positioned in a way that would give a driver adequate time to follow the detour itself at the legal speed limit for that road?
 {¶ 213} "A. Yes. Wait a minute. There were two detours. We're referring to the one on Fountanelle, I assume?
 {¶ 214} "Q. That's correct.
 {¶ 215} "A. Okay. If that's the case, yes.
 {¶ 216} "Q. So at the legal speed limit for that road, the sign was not positioned in a place which would give adequate notice to a driver of the need to detour down Fountanelle Road?
 {¶ 217} "A. To an unaltered driver, yes. *Page 27 
 {¶ 218} "Q. Define an "unaltered driver".
 {¶ 219} "A. Well, I am thinking in terms of the local folk who presumably would have been aware of the situation beforehand, in most cases, as opposed to somebody who was there for the first time.
 {¶ 220} "Q. Okay. So an unaltered driver would be somebody who was there for the first time?
 {¶ 221} "A. That's fair, I mean, that's one part of it.
 {¶ 222} "Q. I'm just trying to understand — The purpose of the sign in question was to alert drivers of two things, correct? One was to — that there was a road closed ahead a mile-and-a-half, correct?
 {¶ 223} "A. A mile-and-a-quarter.
 {¶ 224} "Q. A mile-and-a-quarter?
 {¶ 225} "A. Right.
 {¶ 226} "Q. And, secondly, that folks who were intending to go down Ostrander Road should instead detour onto Fountanelle Road?
 {¶ 227} "A. Right.
 {¶ 228} "Q. And my question to you is: Given that the speed limit for this road is 55 miles per hour, was this sign positioned in a location that adequately warned drivers of the need to detour down Fountanelle Road at 55 miles per hour?
 {¶ 229} "A. I think if a driver were going 55 miles per hour northbound on Ostrander Road there and was not aware of the need to detour previously, that would have been difficult to manage at 55.
 {¶ 230} "Q. Without slamming on the brakes? *Page 28 
 {¶ 231} "A. Right. It would have required slamming on the brakes.
 {¶ 232} "Q. And even then most likely would have slid through the intersection?
 {¶ 233} "A. I think that's reasonable.
 {¶ 234} "* * *
 {¶ 235} "Q. In your opinion, was the sign in question positioned to give adequate time to follow the detour directions for a driver traveling 44 miles per hour?
 {¶ 236} "A. Yes.
 {¶ 237} "Q. Have you attempted to do any calculations of the stopping distance for a driver going 44 miles per hour not with respect to the sign in question but with respect to stopping at Fountanelle Road to follow the directions for the detour?
 {¶ 238} "A. No.
 {¶ 239} "Q. Would you agree that the sign in question was not positioned in a location which would most effectively communicate its message?
 {¶ 240} "Ms. Dorgan: Objection.
 {¶ 241} "The Witness: I think I'd have to give a yes and no answer to that because it's a function of speed and it's also a function of the warnings in general that a driver should have received by that point in time.
 {¶ 242} "At certain speeds and with, let's say, a lack of consideration of other warning signs, I would agree with that, but at other speeds and especially in consideration of prior warnings, no.
 {¶ 243} "By Mr. Hummel:
 {¶ 244} "Q. With respect to the Uniform Manual of Traffic Control Devices which, for simplicity, we will refer to as the manual, under the manual, what is your *Page 29 
understanding as to the assumption that the manual makes about driving speeds for purposes of placement of signs and sight distances for placement of signs?
 {¶ 245} "Do they use the legal speed limit or do they use advisory speed signs as the basis for placement of signs?
 {¶ 246} "A. I don't recall that being specifically addressed in the manual, and I haven't really looked it up in connection with this, so I really don't know.
 {¶ 247} "Q. Well, assuming that — assuming a speed of 55 miles per hour for Ostrander road being the legal speed limit and based on that assumption using 55 miles per hour as the basis for sign placement, would you agree that sign in question under those circumstances was not positioned in the location where it would most effectively communicate its message?
 {¶ 248} "A. Yes.
 {¶ 249} "Q. Assuming a speed of 44 miles per hour, would you also agree with that?
 {¶ 250} "A. No.
 {¶ 251} "Q. Why?
 {¶ 252} "A. Because there was sufficient advance warning for the driver to take the necessary action to avoid problems.
 {¶ 253} "Q. And at 44 miles per hour, the problem in this circumstance is, in fact, the sign in question; is it not?
 {¶ 254} "A. Yes.
 {¶ 255} "Q. The fact that it's in the roadway?
 {¶ 256} "A. Correct. *Page 30 
 {¶ 257} "Q. And there is sufficient time for a driver to stop short of colliding with the sign according to your opinion, correct?
 {¶ 258} "A. If that driver recognizes the potential hazard before he reaches a point 183 feet from the sign. And, moreover, if that driver reacts reasonably promptly and doesn't even simply slam on the brakes, slows and allows the driver to go around the sign, that is also certainly well within the available sight distance.
 {¶ 259} "Q. To go around the sign and stay on the road and pass around the sign safely?
 {¶ 260} "A. Right.
 {¶ 261} "Q. That's your opinion?
 {¶ 262} "A. Yes. That was expressed within my report which is Exhibit 4, I think.
 {¶ 263} "Q. Okay. And at what point in time did you assume that driver would initiate braking in order to accomplish that task of safely driving around the left of the sign?
 {¶ 264} "A. After perception response of a second-and-a-half or thereabouts.
 {¶ 265} "Q. Okay. So in other words, you're assuming that a driver can safely go around the sign when the sign initially becomes visible or when it becomes completely visible?
 {¶ 266} "A. When the driver can get a sense of what is going on up ahead, specifically that the sign in question is in his path.
 {¶ 267} "Q. Okay. And you said that was somewhere approximately around 200 feet?
 {¶ 268} "A. it's in that 200 to 240 range, somewhere in there. *Page 31 
 {¶ 269} "Q. Okay. So somewhere in that range as soon as the driver realizes what's going on, in other words, that the sign is, in fact, in his lane of travel?
 {¶ 270} "A. That's a potential problem.
 {¶ 271} "Q. Okay. At that point in time, you're allowing the driver one-and-a-half seconds of perception/reaction time, and part of your assumption that the driver can safely go around the sign and stay on the road is that they immediately initiate braking?
 {¶ 272} "A. Right. It doesn't have to be panic braking.
 {¶ 273} "Q. And based on that, in fact, you believe that the sign in question did, in fact, convey its message most effectively at that particular location?
 {¶ 274} "A. For a driver going 44, yes.
 {¶ 275} "* * *
 {¶ 276} "Q. Were any of the mandatory provisions that we've identified that you have agreed apply to the sign in question violated by the Delaware County engineers employed by Delaware County in the placement of the sign in question?
 {¶ 277} "A. Yes. The concern or the issue at hand is available sight distance to the sign in question, and I think that provision was violated even though the sign itself in question is consistent with other parts of the manual."
 {¶ 278} Tr. at 58-66; 98-99.
 {¶ 279} Based upon the above, genuine issues of material fact remain as to whether appellee violated the mandatory provisions of the Manual requiring the sign at issue be placed in a position to convey the message most effectively and to provide drivers with adequate time for response.
 {¶ 280} Accordingly, we sustain appellant's first three assignments of error. *Page 32 
 {¶ 281} The July 5, 2006 Judgment Common Pleas is reversed.
 Hoffman, J., Gwin, P.J., and Farmer, J., concur. *Page 33 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Delaware County Court of Common Pleas is reversed and the case remanded to that court for further proceedings consistent with our opinion and the law. Costs assessed to appellee. *Page 1