DECISION.
{¶ 1} On August 1, 2002, a 60-foot wooden light pole fell on and seriously injured plaintiffs-appellants, Brian James and Larry McCabe, two employees of an independent contractor installing a water main through a city park. The employees sued defendants-appellees, the city of Cincinnati and the Cincinnati Recreation Commission (collectively referred to as "the City"), for nuisance on the theory that the City had negligently maintained wooden light poles by allowing the wood to rot. The City moved for summary judgment, arguing that it owed no duty to invitees engaged in an inherently dangerous activity, and that even if it did, any negligence on its part was superseded by a co-worker of James and McCabe who had hit the wire attached to the failed pole with the boom of the track hoe. The City also argued that it was immune from liability.
 {¶ 2} The trial court entered summary judgment in favor of the City, holding that because the employees were engaged in an inherently dangerous activity, the City had no duty to warn of decaying light poles in the area. The trial court further held that, regardless of any duty, the City was statutorily immune from liability because it had been engaged in governmental functions by installing a water main and operating a public park. We reverse the judgment for the following three reasons. First, there are genuine issues of material fact regarding whether the condition of the wooden pole constituted a nuisance and, thus, whether the City had breached its duty to warn the employees of an "abnormally dangerous condition." Second, there are also genuine issues of material fact concerning proximate cause. And, finally, as a matter of law, the City is not immune from liability. *Page 4 
 {¶ 3} The following facts are taken from the parties' and witnesses' depositions, as well as admissions and answers to interrogatories produced during the discovery period.
 {¶ 4} On the date of the accident, James and McCabe were employees of Larry Smith Contractors, Inc. ("Smith"). The City had contracted with Smith to install a concrete water main through Riverside Park, which is owned by the City and operated by the City's recreation commission ("CRC"). The park is located next to the Ohio River and contains several baseball fields.
 {¶ 5} Surrounding the baseball fields are wooden "utility" poles approximately 60 feet high. These poles are considered "light standards," which means they have lights attached to the tops of the poles to illuminate the baseball fields. Suspended between the utility poles, approximately 20 to 25 feet above the ground, is a messenger wire, which is a large, heavy-duty cable that carries other wires that provide electricity to the lights at the ball fields. The messenger wire is attached to the utility poles by a wedge-grip clamp.
 {¶ 6} The installation of the water main required digging a trench path between two utility poles and under the messenger wire. The poles were approximately 30 to 40 feet from the center of the excavation trench. McCabe, the foreman on the job and one of the employees injured, testified that he did not have any concern about the safety of the poles because they were not located so close to the trench that it was likely that the poles would become unearthed. McCabe testified that in the past when utility poles were too close to the excavation trench, he would contact the utility company to inspect the poles and to hold them in place while Smith would dig by the poles. *Page 5 
 {¶ 7} James, the other injured employee and the project manager for Smith, testified that the utility poles appeared strong and structurally stable. With respect to the rest of the worksite, McCabe testified that Smith had all the underground utilities marked so there was no danger of striking a utility while excavating.
 {¶ 8} On the third day of digging the trench, Rusty Speagle, an employee of Smith who was operating a track hoe, a large earth-moving machine, inadvertently "snagged" or "brushed" the messenger wire with the boom of the track hoe. Jeffrey Fishburne, the Cincinnati City Works inspector supervising the installation of the water main, but only to the extent that the installation met the city's specifications, observed part of this incident. He testified that he saw another Smith employee run after Speagle and try to warn him of the snagged wire, but that it was too late. The pole collapsed, hitting a pile of excavated material, which caused the top of the pole containing the aluminum lights to snap off and hit McCabe and James, who were working near the trench.
 {¶ 9} Prior to the pole collapsing, Speagle testified, he had intentionally brushed up against the messenger wire three different times. During those times, another employee had assisted Speagle, ensuring that the messenger wire would gently roll over the boom of the track hoe without snagging. Fishburne, who had previously supervised other installations of water mains, testified that it was common for operators of track hoes to come into contact with wires, and that, sometimes, those wires were pulled down. But he testified that he had never seen a utility pole collapse because a wire had been struck.
 {¶ 10} The wooden utility pole that collapsed, a "Class-2 pole," had been installed in 1972. Ten years later, the City hired a company to inspect the poles in *Page 6 
Riverside Park, when the CRC determined that the lights on the poles needed to be replaced. At that time, the poles were sprayed for fungal spores that caused rot. Thereafter, the utility poles had never been inspected or treated for decay. Jeffrey Koopman, an engineer for CRC, testified that the CRC was responsible for the maintenance of the wooden poles at the park, but that the CRC had no policy regarding inspection of the poles. He testified that this was not necessarily a "conscious decision," but simply that the City did not inspect the poles again after 1982.
 {¶ 11} Speagle, an employee at Smith, testified that he had observed the utility pole after it had collapsed and that one could have grabbed the wood at the base of the pole and crumbled it like sawdust. A video taken of the failed pole showed rot and decay at the pole's failure point near the base.
 {¶ 12} Robert Peters, the City's engineering expert in structural design, including the design of wooden utility poles, reviewed photographs and a video of the collapsed pole, noting that probably more than 50% of the pole, at its failure point, had decayed. But he also testified that the pole had at least two inches of healthy wood surrounding the decayed area. He conceded that he had not actually observed a uniform circumference of two inches of healthy wood, but had made this assumption after noting that there were four inches of healthy wood on the tension side of the pole. (The wood on the compression side of the pole had obviously disintegrated during the collapse.) Given the condition of this Class-2 pole, Peters testified that it could have withstood 3500 pounds of force applied at the position where the track hoe had contacted the wire, approximately 20 feet above the ground.
 {¶ 13} Because the pole could have withstood 3500 pounds of force despite its internal decay, Peters opined that the pole had not suffered a reduction of more *Page 7 
than one-third of its ability to carry its required design load. Under the National Electric Safety Code ("NESC"), which sets forth the minimum load requirements of a utility pole for power lines, a light-standard pole is only required to withstand 1640 pounds of force at 20 feet above the ground. Because the NESC recommends that a utility pole be replaced when it has been reduced by more than one-third of its ability to carry its required design load, Peters opined that the utility pole here did not need to be replaced at the time of the accident because it was in compliance with the NESC.
 {¶ 14} Peters further testified that the pole was overdesigned for its intended use as a light standard. Peters testified that a healthy Class-4 pole, which is significantly smaller than a Class-2 pole and designed to withstand only 2400 pounds of lateral force at the top of the pole, would have met the NESC's design-load requirements for a light-standard utility pole.
 {¶ 15} Finally, Peters testified that he recommended a maintenance program to anyone that had wooden light poles and that a maintenance program for wooden light poles required "inspection." Peters testified that the City should have been inspecting the wooden light poles every ten years. He also testified that the rate of deterioration (more than 50%) in the pole here was probable, and thus predictable, over a 30-year period in view of the "decay zone rate" of the Ohio River Valley.
 {¶ 16} William Sites, Ph.D., an expert in product pathology, which is the study of decay processes in wood products, testified for James and McCabe. He testified that, at the pole's point of failure, approximately 75% of the cross section was completely destroyed by fungal decay and termites, and that this decay was the result of the City failing to maintain the pole over a 20-year period. Further, in view of the amount of lateral load that a healthy Class-2 pole could withstand, which was *Page 8 
8800 pounds of force at the point the messenger wire was attached to the pole, he testified that the physical strength and integrity of the pole was so compromised by the advanced degree of fungal rot that the pole was subject to sudden collapse at any time from a strong wind or additional weight from ice accumulation. Sites also testified that the City had been aware that the pole had significant decay as early as 1982, twenty years before the accident, because the pole had been treated for rot at that time.
 {¶ 17} Next, James and McCabe's engineering expert, Daniel Aerni, testified that the failure of the utility pole had resulted from the internal deterioration of the pole, and that if the pole had been healthy, it would not have failed in the manner that it had. Aerni based his opinion on the fact that a portion of the wedge-grip clamp, which we refer to as the "bail," was appropriately sized and constructed so that it would fail prior to the failure of a proper and sound utility pole. Aerni tested the bail and determined that its tensile strength was 2800 pounds, which meant that if a force of more than 2800 pounds was placed on the wire, the bail would fail and the messenger wire would fall to the ground. But here the bail did not fail, which, in Aerni's opinion, demonstrated that the force that the track hoe had placed on the messenger wire when it had inadvertently hooked it was less than 3000 pounds. Accordingly, Aerni testified that in his expert opinion the cause of the pole falling was the internal deterioration of the pole, not the force applied by the track hoe.
 {¶ 18} In their single assignment of error, James and McCabe now argue that the trial court erred by granting the City's motion for summary judgment on their claim for nuisance, which they alleged resulted from the City's negligent failure to inspect and maintain (keep free from nuisance) the wooden light poles located in Riverside Park. *Page 9 
 {¶ 19} We review a summary-judgment order de novo.[1] Summary judgment is appropriate when (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) with the evidence construed most strongly in favor of the nonmoving party, reasonable minds can only conclude in favor of the moving party.[2] If any doubts exist, the issue must be resolved in favor of the nonmoving party.[3]
 {¶ 20} The parties do not dispute, and we agree, that at the time that James and McCabe were injured the City had a statutory duty to keep Riverside Park in repair and free from nuisance. The version of R.C. 2744.02(B)(3) in effect at the time of the accident provided that "political subdivisions are liable for injury * * * caused by their failure to keep * * * public grounds within the political subdivisions open, in repair, and free from nuisance." And R.C. 723.01 provides that "a municipal corporation shall have the care, supervision, and control of * * * public grounds * * *, and the municipal corporation shall cause them to be kept open, in repair and free from nuisance."
 {¶ 21} A "qualified nuisance" is frequently the consequence of negligence.[4] Thus, "a civil action based upon the maintenance of a qualified nuisance is essentially an action in tort for the negligent maintenance of a condition, which, of itself, creates an unreasonable risk of harm, ultimately resulting in injury. The dangerous condition constitutes the nuisance. The action for damages is predicated upon carelessly or negligently allowing such condition to exist."[5] *Page 10 
 I. Nuisance {¶ 22} Based upon the evidence presented, we first address whether the light pole here was a qualified nuisance. Generally, the phrase "free from nuisance" in former R.C. 2744.02(B)(3) has been interpreted by Ohio courts in the context of an alleged failure by a political subdivision to keep its roads and highways free from physical obstructions that interfere with visibility or create an unsafe condition on the regularly traveled portion of the road. Classic examples of nuisances include a malfunctioning traffic light, a pothole in the roadway, or an overhanging tree limb.[6] Other recent examples of a qualified nuisance are a water meter near a golf course with an inadequately secured cover[7] and a negligently maintained fireplace.[8] Case law essentially indicates that a qualified nuisance is a condition that exists within the political subdivision's control, and that creates a danger for others on the regularly used portion of the premises.[9]
Therefore, we hold that if the pole here, which was located near a ball field, was not strong enough to withstand ordinary weather conditions and to perform the job it was intended to do so that it was subject to collapse, then it was a qualified nuisance.
 {¶ 23} A review of the record demonstrates that James and McCabe presented evidence that the light pole was a nuisance. The parties' experts all testified that, at the point of failure, the pole was at least 50% decayed. Further, the wood pathologist, Sites, testified that the physical strength and integrity of the pole was so compromised by the advanced degree of fungal rot that it was subject to sudden collapse at any time from a strong wind or additional weight from ice *Page 11 
accumulation. Accordingly, we hold that it was for the trier of fact to determine whether the City had created an unreasonable risk of harm by maintaining a wooden light pole with internal decay in a public park, and thus had maintained a nuisance.
 II. Standard of Care {¶ 24} In a civil action based on the maintenance of a nuisance, as here, the standard of care that a city owes to injured parties is the same standard of care required of owners and occupiers of land toward business invitees, which is to keep the premises in a reasonably safe condition and to warn of dangers known to the owner or occupier.[10]
The City argues that because James and McCabe were employees of an independent contractor engaged in an inherently dangerous activity, the City did not owe them this duty of care.
 {¶ 25} The Ohio Supreme Court has held that "where an independent contractor undertakes to do work for another in the very doing of which there are elements of * * * danger * * *, no liability * * * ordinarily attaches to the one who engaged the services of the independent contractor."[11] But such an invitee may recover when the injury results "by reason of [an] abnormally dangerous condition of the premises, only if the [owner] has, and the [independent contractor] has not, actual or constructive notice of the existence of such condition."[12]
 {¶ 26} The City argues that because excavating is an inherently dangerous activity, it owed no duty to James and McCabe. We agree that excavating involves inherent dangers such as striking an underground utility, digging too close to a pole so that it may become destabilized, or collapsing a trench. But we are not persuaded *Page 12 
that the danger of collapse posed by a decaying pole that is more than 30 feet from the center of a trench and outside the work perimeter is an inherent danger of excavating.[13] Accordingly, under these circumstances, we hold that if this pole had the potential of collapsing due to its internal decay and rot (in other words, if it was a qualified nuisance), then it would constitute an abnormally dangerous condition on the premises. Thus, the City would have had a duty to warn of this condition if it had actual or constructive knowledge of it, and if Smith and its employees did not.
 {¶ 27} Here, James and McCabe presented evidence that the City had constructive knowledge that the wooden poles in Riverside Park, and specifically the pole that failed, were decaying and in danger of collapsing. Sites, the expert in wood pathology, testified that the City was aware that the pole had significant decay as early as 1982, when it had treated the pole for rot. Peters, the City's expert, admitted that the rate of the decay in the pole since the date of its installation in 1972 was predictable. Accordingly, we hold that there was a genuine issue of material fact regarding whether the City had constructive knowledge of the condition of the pole.
 {¶ 28} Briefly, we note that the trial court determined that even if the City had a duty to warn Smith of dangerous conditions on the property, this duty was relieved because the condition of the light poles were "open and obvious." We disagree with this contention because James testified that the poles appeared structurally stable and sound, and because there was no evidence presented that there was decay, rot, or fungus on the outside of the pole. The pole was internally decayed. Accordingly, we hold that the condition of the collapsed pole was not "open and obvious" so as to relieve the City of any duty owed to James and McCabe. *Page 13 
 III. Breach of Duty {¶ 29} To establish negligence, James and McCabe had to prove that the City had breached its duty of care. James and McCabe alleged that the City, by failing to inspect and maintain the wooden utility poles at Riverside Park for twenty years, had breached its duty to keep the premises in a reasonably safe condition. And they presented evidence to demonstrate the breach. All the parties' experts agreed that the wooden utility poles should have been inspected every ten years. The City's expert, Peters, specifically testified that maintenance of wooden utility poles required inspection. Koopman, the head engineer at CRC, testified that the City had not inspected any of the wooden utility poles since 1982 and did not have an inspection program in place. Finally, Sites testified that if the City had been inspecting the wooden utility poles in ten-year increments, it would have discovered that the pole in question was rotting and would have replaced or repaired it. Based on this evidence, we hold that there was a genuine issue regarding whether the City had breached its duty by failing to inspect and treat the wooden utility poles at Riverside Park.
 {¶ 30} We note that the City argued below that the evidence it presented that the poles were in compliance with the NESC standards for design-load strength conclusively demonstrated that the City was not negligent in maintaining the poles. But we have held that "proof of a [city's] compliance with the National Electric Safety Code in the erection and maintenance of [wooden utility poles], although probative of the [city's] conformity with the requisite standard of care, is not dispositive of that issue. "[14] The trier of fact must also consider whether it was foreseeable that a decayed light pole had the potential of collapsing when ordinary loads were applied *Page 14 
to the pole. If so, then this may be indicative of the City having not met its standard of care.
 IV. Proximate Cause {¶ 31} Finally, to establish negligence, James and McCabe had to prove that the breach of duty was the proximate cause of their injuries.[15]
The City argues that even if it was negligent in maintaining the wooden poles or failing to warn Smith of the condition of the poles, the collapse of the utility pole was caused by the intervening act of an employee of Smith: Speagle snagged the messenger wire with the track hoe and exerted a force against the pole that it was not supposed to withstand. But James and McCabe presented evidence that the cause of the failure of the pole was its internal deterioration. Aerni testified that the bail had not failed when the track hoe hit the messenger wire, which meant that the track hoe could not have placed more than 2800 to 3000 pounds of pressure on the wire, given that the bail was manufactured to fail at 2800 pounds of force. Accordingly, Aerni opined that the pole had failed as a result of internal deterioration, in light of the evidence that the pole should have been able to withstand 3500 pounds of force. Viewing the evidence in a light most favorable to the nonmoving party, we conclude that there remain genuine issues of fact regarding whether the City's alleged negligence in failing to maintain the wooden poles had proximately caused James and McCabe's injuries.
 V. Immunity {¶ 32} The trial court also determined that the City, even if it was negligent, was immune from liability. We disagree. *Page 15 
 {¶ 33} A reviewing court must engage in a three-tiered analysis to determine whether a political subdivision is entitled to immunity from civil liability pursuant to R.C. Chapter 2744.[16] The first tier in the analysis is to determine whether the entity claiming immunity is a political subdivision and whether the alleged harm occurred in connection with a governmental or a propriety function.[17] The general rule is that political subdivisions are not liable in damages. But if it is determined that an entity is a political subdivision entitled to immunity under the first tier in the analysis, then the court must move to the second tier and determine whether any of the exceptions to liability enumerated in R.C. 2744.02(B) apply.[18] If any of the R.C. 2744.02(B) exceptions to immunity are found to be applicable, then the political subdivision can reclaim its immunity under the third tier by proving that one of the defenses to liability in R.C. 2744.03 applies.[19]
 {¶ 34} With respect to the first tier of the analysis, it is undisputed in this case that the City is a political subdivision and that the alleged harm occurred in connection with the governmental function of maintaining a recreational area or park.[20]
 {¶ 35} Thus, immunity would exist unless one of the exceptions set forth in R.C. 2744.02(B) applies. As we have already noted, the parties do not dispute that the City had a duty, under R.C. 2744.02(B)(3), to keep public parks open, in repair, and free from nuisance.[21] Thus, we must now turn to the third tier of the analysis to determine whether any of the defenses to liability apply. *Page 16 
 {¶ 36} The City argues that the defense set forth in R.C. 2744.03(A)(5) is applicable. R.C. 2744.03(A)(5) provides that a political subdivision is immune from liability for an injury resulting from the "exercise of discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner." Essentially, the City argues that it had the discretion to determine whether to inspect the wooden utility poles and to what extent it should have inspected them. This argument is unpersuasive.
 {¶ 37} The immunity provided by R.C. 2744.03(A)(5) "operates to protect political subdivisions from liability based upon discretionary judgments concerning the allocation of scarce resources; it is not intended to protect conduct which requires very little discretion or independent judgment. The law of immunity is designed to foster freedom and discretion in the development of public policy while still ensuring that implementation of political subdivision responsibilities is conducted in a reasonable manner. Thus, a political subdivision can be held liable for damages stemming from negligent maintenance of its buildings or grounds."[22]
 {¶ 38} Accordingly, while it was within the City's discretion to determine whether to use wooden or steel light poles at Riverside Park, it did not have the discretion not to maintain those light poles once they were in place. Because the City's own expert testified that a proper maintenance program for wooden light poles necessarily requires inspection, preferably every 10 years, we hold, as a matter of law, that the City did not have discretion in deciding whether to implement an *Page 17 
inspection program. Here, Koopman, the engineer at CRC, testified that the City did not have a written policy on inspections in place even though it was responsible for maintaining the wooden utility poles at the park and had not inspected the wooden poles in over twenty years.
 {¶ 39} Therefore, because there is nothing "discretionary" in whether a city is to carry out its duty, and because the evidence in this case demonstrated that inspection of the wooden poles is part of the city's duty, we hold that this defense does not apply under these circumstances.[23] Accordingly, the City is not immune from liability.
 {¶ 40} Because there are genuine issues of material fact in this case regarding whether the condition of the wooden light pole at issue was a nuisance; whether the City breached its duty; and whether that breach was the proximate cause of the pole collapsing and injuring James and McCabe; and because, as a matter of law, the City was not immune from liability, the trial court erred in entering summary judgment in favor of the City. Accordingly, we sustain the single assignment of error. We reverse the judgment of the trial court and remand this case for further proceedings in accordance with this decision and the law.
Judgment reversed and cause remanded.
CUNNINGHAM, J., concurs.
HENDON, J., dissents.
[1] Hillyer v. State Farm Mut. Auto. Ins. Co. (1999), 135 Ohio App.3d. 172, 175, 722 N.E.2d 108.
[2] Civ. R. 56(C); Horton v. Harwick Chemical Corp., 73 Ohio St.3d 679,686-687, 1995-Ohio-286, 653 N.E.2d 1196.
[3] Murphy v. Reynoldsburg, 65 Ohio St.3d 356, 358-59, 1992-Ohio-95,604 N.E.2d 138.
[4] Rothfuss v. Hamilton Masonic Temple Co. (1973), 34 Ohio St.2d 176,180, 297 N.E.2d 105, citing Taylor v. Cincinnati (1944),143 Ohio St. 426, 441, 55 N.E.2d 724.
[5] Id.
[6] See Franks v. Lopez (1994), 69 Ohio St.3d 345,632 N.E.2d 502.
[7] Neville v. Wyoming, 1st Dist. No. C-020064, 2002-Ohio-1463.
[8] Mathna v. Wagner (Nov.4, 1994), 6th Dist. No. CA 93-WD-050.
[9] See Harp v. Cleveland Heights, 87 Ohio St.3d 506, 511,2007-Ohio-467, 721 N.E.2d 1020.
[10] Eicher v. U.S. Steel Corp. (1987), 32 Ohio St.3d 248,512 N.E.2d 1165
[11] Id. at 249, citing Wellman v. East Ohio Gas Co. (1953),160 Ohio St. 103, 113 N.E.2d 629, paragraph one of the syllabus.
[12] Id., citing Davis v. Charles Shutrump Sons Co. (1942),140 Ohio St. 89, 42 N.E.2d 663, paragraph one of the syllabus.
[13] See Wheeler v. GTE North, Inc. (June 22, 1995), 4th Dist. No. 94CA744 (holding that a collapse due to a faulty pole was not an inherent danger for a lineman who had climbed the pole to replace a wire).
[14] Brauning v. Cincinnati Gas Electric Co. (1989),54 Ohio App.3d 38, 560 N.E.2d 811.
[15] Curtis v. Ohio (1986), 29 Ohio App.3d 297, 299,504 N.E.2d 1222.
[16] Hubbard v. Canton City School Bd. of Edn., 97 Ohio St.3d 451,2002-Ohio-6718, 780 N.E.2d 543, at ¶ 10, citing Cater v. Cleveland,83 Ohio St.3d 24, 28, 1998-Ohio-421, 697 N.E.2d 610.
[17] R.C. 2744.02(A)(1); Hubbard, supra, at ¶ 10.
[18] Cater, supra, at 28.
[19] Id.
[20] See R.C. 2744.01(C)(2)(u).
[21] If the trier of fact, on remand, determines that the wooden light pole here was not a qualified nuisance, the issue of immunity becomes moot.
[22] Frederick v. Vinton County Bd. of Edn., 2004-Ohio-550, citingHall v. Fort Frye Local School Dist. Bd. of Edn. (1996),111 Ohio App.3d 690, 699, 694, 676 N.E.2d 1241.
[23] See McVey v. Cincinnati, 109 App.3d 159, 671 N.E.2d 1288, citingBolding v. Dublin Local Sch. Dist. (June 15, 1995), 10th
Dist. No. 94APE09-1307 (holding that the immunity provided by R.C. 2744.03(A)(5) only attaches to the "broad type of discretion involving `public policy made with the creative exercise of political judgment.'"