KENKO CORPORATION et al., Appellees,

v.

CITY OF CINCINNATI, Appellant.

[Cite as *Kenko Corp. v. Cincinnati,* 183 Ohio App.3d 583, 2009-Ohio-4189.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–080246.

Decided Aug. 21, 2009.

Xanders & Xanders Co., L.P.A., and Christopher H. Hurlburt, for appellees.

John P. Curp, City Solicitor, and William C. Hicks, Senior Assistant City Solicitor, for appellant.

---

J. Howard Sundermann, Judge.

{¶ 1} Plaintiffs-appellees, Kenko Corp. and Sonoma Hill, L.L.C. ("Sonoma"), sued defendant-appellant, the city of Cincinnati, to recover damages for costs incurred in preparing a city-owned tract of land for the construction of Sonoma Court, a public right of way in a subdivision created by Sonoma. Following discovery, the city moved for summary judgment under R.C. Chapter 2744 and on the merits. The trial court denied the city's motion as to all claims. The city now appeals the trial court's denial of its motion for summary judgment on the issue of its sovereign immunity.

## I. The Sonoma Hills Subdivision

{¶ 2} The current dispute between the parties arises from the development of the Sonoma Hills subdivision in the Madisonville section of Cincinnati. Kenko Corporation owned a parcel of property with difficult topography in Madisonville. In early 2003, Ken Robinson, Kenko's project manager, and Gerald Robinson, Kenko's president, decided to develop a residential subdivision on the property if they could obtain an infrastructure subsidy from the city. At that time, the city, in an effort to encourage more residential-housing projects, was administering various programs to pay for infrastructure improvements in subdivision develop-

ments that might not have otherwise attracted private investment. Kenko and Sonoma Hill, L.L.C., a single-member limited-liability company owned by Ken Robinson, ultimately formed a joint venture to develop the property.

{¶ 3} In March 2003, Ken met with Mary Foote, a senior analyst with the city's Community Development and Planning Department ("CDP"), and Jim Smith, an engineering technical advisor with the Department of Transportation and Engineering ("DOTE"), at the property. According to Ken, Foote was pleasantly surprised by the project's potential and told him that the project could work. Foote told Ken about the city's procedure for infrastructure funding: everything in the right of way except for the retaining walls would be the city's responsibility, and everything on the surrounding property would be Sonoma's responsibility. Foote cited two nearby subdivisions, Woodcrest and Butterfield, as examples of the funding and the infrastructure improvements it covered.

{¶ 4} Shortly thereafter, Sonoma prepared a 2003 City Development Funding Application, allocating costs for everything in the right of way to the city and everything outside the right of way to Sonoma. The final version of the application allocated, at the city's request, costs to the city for a Conspan Bridge instead of the much less expensive culvert bridge originally proposed by Sonoma. It also allocated to the city costs for the sidewalks on both sides of Sonoma Court and on one side of Strathmore Drive, the street leading to Sonoma Court, even though none of the lots in the development were situated on Strathmore. Finally, the cost of the final course of blacktop on Sonoma Court was allocated to the city.

{¶ 5} The application additionally required that Sonoma provide the city with information totally unrelated to infrastructure improvements, including the number of homes to be built, their square footage, their anticipated selling prices, and a market study of the development. In addition, Sonoma was required to produce architectural concepts, floor plans, architectural restrictions, and the name of builders with whom Sonoma had been negotiating.

{¶ 6} The estimates outlined in the application for the city's portion of the development were prepared without any allowance for prevailing-wage costs imposed on the city by R.C. Chapter 4115. The application did not require that estimates be adjusted to account for prevailing wages and, in fact, contained no reference to them at all.

{¶ 7} By September 2003, Sonoma's cost of preparing the site plans, engineering studies, and other documentation for the city's use totaled $111,569.85. Prior to incurring these expenses, Ken had asked Foote for written confirmation of Sonoma's and the city's respective obligations in the development. Foote insisted that this was unnecessary. She assured Ken that Peg Moertl, the director of CDP, had approved the city's obligations, that funding was readily available, and

that he should keep the project moving so that the city could start construction in the fall of 2003. Foote also indicated that putting anything in writing would trigger the application of prevailing wages to the entire project, a concern communicated to Smith as well.

{¶ 8} For the next few months, Foote continued to assure Ken that the city would pay for all items in the right of way. This was confirmed in a July 2003 memo from Smith, with a copy to Ken, which stated that "[t]he infrastructure construction will be a City contract, including all items within the R/W and all earthworks supporting it." According to Smith, allocating infrastructure costs to the city was the "normal course of the way these projects proceed[ed]," and the term "earthworks" specifically included bringing the roadway up to grade.

{¶ 9} Cincinnati City Council approved the plans for dedication and accepted Sonoma Court at a council meeting on September 24, 2003. The city paid nothing to Kenko or Sonoma Hill for the property. After that meeting, Ken was unable to speak with any city representative until mid-October 2003, when Smith called him and said that the city had refused to approve any funds for the project unless Sonoma agreed to bring the earthworks in the right of way within two feet of the final grade. Smith told Ken that this would be the only infrastructure obligation transferred to Sonoma. Smith characterized this condition as "unusual" because "in none of the other projects that I worked on was there a need to break out part of the infrastructure work and put it on the responsibility of the developer." Because Sonoma had already spent $111,569.85 on the project and had already given the right of way to the city, Ken agreed to the earthworks condition in an effort to salvage the project. Sonoma incurred expenses of approximately $87,000 in performing this work.

{¶ 10} From that point forward, the city continued to shift infrastructure items to Sonoma. The city insisted that Sonoma pay for all right–of–way utility trenching, sidewalks on Sonoma Court, and the final course of blacktop. Sonoma was also forced to pay for as-built drawings and telescoping for the stormwater system underneath Sonoma Court, because Sonoma's homebuilder could not continue construction until that work was completed, and because the city was unable to get its roadway contractor, R.B. Jergens, to do it.

{¶ 11} The contract between R.B. Jergens and the city contained 62 pages of information regarding compliance with prevailing-wage statutes. It also contained provisions stating that the earthworks, the Sonoma sidewalks, and the final course of blacktop were Sonoma's responsibility. However, neither Kenko nor Sonoma was a party to the city's contract with R.B. Jergens. Ken had never seen the contract until his deposition in September 2006. While Ken attended an April 2004 meeting where the contract was allegedly discussed, this was eight months after Sonoma had incurred considerable development expenses and the city had already taken the property for Sonoma Court.

{¶ 12} Between September and November 2003, CDP underwent a management audit performed by the internal audit division of the city's finance department. The audit found that CDP did not have any operational policies or procedures. Laura Porter, the interim director of CDP at that time, confirmed in her deposition that upon her arrival at the department in December 2003, she was unable to find any written procedures governing the department.

{¶ 13} The program through which a development obtained infrastructure funding came to be known as the "Infrastructure Pilot Program." It was the subject of a "for your information" memo to Cincinnati City Council from City Manager Valerie Lemmie, dated March 28, 2004. The memo was largely authored by Porter and was drafted in response to complaints that the council had received from developers regarding project commitments made to them by CDP. In it, Lemmie outlined evidence that multimillion-dollar commitments had been made on Woodcrest, Sonoma, and a third project called Edgehill Place without any communication to the council. She noted that some of the developers had already dedicated roadway property at no cost to the city with some expectation of assistance in return.

{¶ 14} With respect to Sonoma, Lemmie noted that "it is the developer's expectation that the City will construct Sonoma Court (Street), a bridge, water and sewer lines, sidewalks, decorative lighting, and landscaping in the dedicated right-of-way." Lemmie ultimately recommended funding for the project because "there [was] a sound basis to conclude that the subdivision [would] be completed," as evidenced by a letter of intent from Sonoma's homebuilder and a completion schedule prepared by Sonoma.

## II.  Sovereign Immunity

{¶ 15} In a single assignment of error, the city now argues that the trial court erred as a matter of law in denying its motion for summary judgment because it was entitled to sovereign immunity under R.C. Chapter 2744.

{¶ 16} We review the trial court's decision on a summary-judgment motion de novo. Summary judgment is appropriate when "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party." [1]

{¶ 17} R.C. Chapter 2744 sets forth a three-tiered analysis for determining whether a political subdivision is immune from liability. First, R.C. 2744.02(A)(1)

---

1. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267.

sets forth the general rule of immunity. It provides that political subdivisions are not liable in damages for injuries allegedly caused by an act or omission of the political subdivision or an employee of the political subdivision. But the immunity afforded to a political subdivision by R.C 2744.02(A)(1) is not absolute; it is subject to five exceptions listed in R.C. 2744.02(B). Thus, once immunity is established under R.C. 2744.02(A)(1), the second tier of the analysis involves a determination whether any of the five exceptions to immunity in section (B) applies. If an exception applies, the third tier of the analysis is concerned with whether immunity may be reinstated under one of the defenses contained in R.C. 2744.03.[2]

## A. The City's Involvement in the Sonoma Hills Subdivision Was a Proprietary Function

{¶ 18} The city argues that its involvement in constructing a road in the Sonoma Hills subdivision was a governmental function for which it was entitled to immunity under R.C. 2744.02(A)(1). The city further contends that Sonoma's promissory-estoppel claim was barred by the Ohio Supreme Court's decision in *Hortman v. Miamisburg*, which prohibits claims for promissory estoppel against a political subdivision for the performance of governmental functions.[3]

{¶ 19} Road construction is not specifically identified in the laundry list of governmental functions contained in R.C. 2744.01(C)(2). To get around this, the city cites R.C. 2744.01(C)(2)(l), which classifies as governmental functions "the provision or nonprovision, planning or design, construction or reconstruction of a public improvement, including, but not limited to a sewer system." The term "public improvement," however, is not defined in the Revised Code.

{¶ 20} The city also relies on R.C. 2744.01(C)(2)(e), which identifies as governmental functions "[t]he regulation of the use of, and the maintenance and repair of, roads, highways, streets, avenues, alleys, sidewalks, bridges, aqueducts, viaducts, and public grounds." R.C. 2744.01(C)(2)(e), however, is limited by its terms to the regulation, maintenance, or repair of roads, none of which involve construction.

{¶ 21} While the city relies upon two cases that hold that road construction is a governmental function, both cases are over 50 years old and have been superseded by the enactment of the current sovereign-immunity statute.[4] As a result,

---

2. *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 697 N.E.2d 610.

3. 110 Ohio St.3d 194, 2006-Ohio-4251, 852 N.E.2d 716, syllabus.

4. *Davis v. Charles Shutrump & Sons Co.* (1942), 140 Ohio St. 89, 23 O.O. 299, 42 N.E.2d 663; *Superior Laundry & Towel Supply Co. v. Cincinnati* (1959), 11 O.O.2d 352, 168 N.E.2d 447.

---

neither case may be reasonably relied upon for interpreting a statutory framework that would not exist until nearly half a century later. And there are no other cases decided after the enactment of the statute that specifically address road construction.

{¶ 22} R.C. 2744.01 defines a proprietary function as follows:

{¶ 23} "(G)(1) 'Proprietary function' means a function of a political subdivision that is specified in division (G)(2) of this section or that satisfies both of the following:

{¶ 24} "(a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2) of this section;

{¶ 25} "(b) The function is one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons."

{¶ 26} Road construction is not identified as a proprietary function under R.C. 2744.01(C)(1)(a), nor does it appear in R.C. 2744.01(C)(1)(a) or (b) or R.C. 2744.01(C)(2). R.C. 2744.01(G)(1)(a) is therefore satisfied. As for the criteria set forth in R.C. 2744.01(G)(1)(b), even the city acknowledges that streets and sewers in residential subdivisions have historically been constructed by private parties and not by the city.

{¶ 27} In the absence of an explicit statutory definition, whether a function is governmental or proprietary must be determined by "defining what it is that the political subdivision is actually doing when performing the function."[5] The Ohio Supreme Court has addressed this issue in *Greene Cty. Agricultural Soc. v. Liming*, where the Greene County Agricultural Society was sued for investigating an entrant in a hog contest.[6] The court noted:

{¶ 28} "In resolving this question, we must first recognize that a central consideration within the structure of R.C. Chapter 2744 is the premise that some activities of a political subdivision may be governmental functions, while some other activities are not. Thus, the issue here is not whether holding a county fair is a governmental function; rather, it is the more specific question of whether conducting the hog show at the county fair and conducting the investigation into the allegations of irregularity surrounding the entry of Big Fat [the winning pig] in that hog show are governmental functions."[7]

---

5. *Allied Erecting & Dismantling Co. v. Youngstown*, 151 Ohio App.3d 16, 2002-Ohio-5179, 783 N.E.2d 523, ¶ 23.

6. (2000), 89 Ohio St.3d 551, 733 N.E.2d 1141.

7. Id. at 561, 733 N.E.2d 1141.

{¶ 29} The court ultimately held that the Green County Agricultural Society was engaged in a proprietary function, even though holding a county fair with hog contests is a governmental function.[8]

{¶ 30} Here, the city maintains that its involvement with the development was limited to the planning and construction of Sonoma Court and the sewer facilities beneath it, and that both were governmental functions. But the city was not engaged in the simple planning and design of a street. It was planning and designing a subdivision.

{¶ 31} In the application, the city required far more information than necessary to determine whether a road should be constructed, as evidenced by its request for a market study, architectural plans for proposed homes, and the names of proposed builders. Furthermore, the city manager, in her memo to city council, recommended funding the project not because Sonoma Court was likely to be constructed, but because completion of the housing development around it was all but assured. Finally, securing the development of the subdivision within city limits, with its $7 million in new, marketable homes, could only have been considered a promotion of the "public peace, health, safety, or welfare" under R.C. 2744.01(G)(1)(b).

{¶ 32} The foregoing demonstrates that what the city was "actually doing" in this case was something that private residential developers customarily engage in. Under *Greene*, its function could be considered proprietary even though it included governmental activities. We, therefore, agree with the trial court that Sonoma's claims were not barred by either R.C. 2744.02(A)(1) or *Hortman*. As a result, we find the city's argument meritless.

**B. The City's Negligent Administration of the Infrastructure Improvement Program Was Not a Discretionary Decision under R.C. 2744.03(A)(5)**

{¶ 33} Finally, the city argues that even if its involvement in the development of the Sonoma Hills subdivision constituted a proprietary function, it was still entitled to have immunity reinstated under R.C. 2744.03(A)(5), which provides the following:

{¶ 34} "The political subdivision is immune from liability if the injury, death, or loss to persons or property resulted from the exercise of judgment or discretion in determining whether to acquire or how to use equipment, supplies, materials, personnel, facilities and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner."

---

8. Id.

{¶ 35} But this court has held that the "exercise of judgment and discretion" contemplated by R.C. 2744.03(A)(5) does not apply to every decision that a city makes. In *McVey v. Cincinnati,* we clarified that R.C. 2744.03(A)(5) only involves "the broad type of discretion involving public policy made with 'the creative exercise of political judgment.'" [9] We adopted the immunity analysis applied to a school board by the Tenth Appellate District in *Bolding v. Dublin Local School Dist.:*

{¶ 36} "If the particular conduct alleged * * * was one characterized by a high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning, such as the design and type of school buses, the board of education was immune from liability. If, however, the accident was caused by the negligence of school teachers or employees carrying out the activity, i.e., the operation of the school bus by an employee, the board of education remained liable for the conduct of its employees." [10]

{¶ 37} While in this case the city may legitimately claim an exercise of discretion in establishing an infrastructure-improvement program, it cannot claim "discretion" in choosing to negligently administer it. Here, the city articulated no policies for its CDP employees to follow in implementing the infrastructure-improvement program, and this allowed the city to acquire private property without consideration in exchange for commitments that CDP employees were, in the absence of any rules to the contrary, allowed to make. Because Sonoma's damages resulted from the city's administration of the infrastructure-improvement program, and not its decision to create the program in the first instance, *McVey* preempts the city's invocation of R.C. 2744.03(A)(5) to avoid responsibility for its negligent acts. We therefore overrule the city's sole assignment of error and affirm the judgment of the trial court denying the city's motion for summary judgment on its claim of sovereign immunity.

Judgment affirmed.

PAINTER, P.J., concurs.

DINKELACKER, J., dissents.

PAINTER, Presiding Judge, concurring.

{¶ 38} There they go again. The city of Cincinnati—through a department that admittedly has no procedures whatever—leads a developer down a garden path, costing the developer a lot of money. The city promises to reimburse the money and then reneges. Now, the city relies on the old "we are immune"

---

9. (1995), 109 Ohio App.3d 159, 163, 671 N.E.2d 1288, quoting *Bolding v. Dublin Local School Dist.* (June 15, 1995), 10th Dist. No. 94APE09–1307, 1995 WL 360227.

10. Id. at 162, 671 N.E.2d 1288, citing *Bolding.*

excuse: "N'ya, n'ya, n'ya said the little fox, N'ya, n'ya, ya can't catch me. N'ya, n'ya, n'ya, said the little fox. Singing merrily."[11] But this time, they are caught.

{¶ 39} There should be no sovereign immunity. It is a relic of a past filled with kings—and knaves. We no longer have a king, though we still have enough knaves.

{¶ 40} The dissent falls for the much discredited "discretion" ruse. I thought we had put that foolishness safely to rest in *McVey*[12] and *Hacker*.[13] But it seems a whack-a-mole situation—the argument keeps popping up. Unfortunately, the dissent will just encourage the moles.

DINKELACKER, Judge, dissenting.

{¶ 41} I must respectfully dissent. But this dissent offers no semblance of approval for the manner in which the city of Cincinnati conducted its dealings with Sonoma. Nonetheless, the city is entitled to immunity.

{¶ 42} The Revised Code defines a governmental function as including "the provision or nonprovision, planning or design, construction, or reconstruction of a public improvement, including, but not limited to, a sewer system."[14] It also includes a "function that promotes or preserves the public peace, health, safety, or welfare; [and] that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons."[15]

{¶ 43} I agree with the majority's determination that "securing the development of the subdivision within city limits, with its $7 million in new, marketable homes" can only be considered a promotion of the "public peace, health, safety, or welfare"; but I believe that it does so through "activities that are not engaged in or not customarily engaged in by nongovernmental persons."

{¶ 44} The majority correctly writes that a governmental function is determined by " 'defining what it is that the political subdivision is actually doing when performing the function.' "[16] It is in how the majority applies the rule that I part ways with my colleagues.

---

**11.** Kay Kyser, *The Little Red Fox*, at http://www.lyricstime.com/kay-kyser-the-little-red-fox-lyrics.html.

**12.** *McVey v. Cincinnati* (1995), 109 Ohio App.3d 159, 671 N.E.2d 1288.

**13.** *Hacker v. Cincinnati* (1998), 130 Ohio App.3d 764, 721 N.E.2d 416.

**14.** R.C. 2744.01(C)(2)(l).

**15.** R.C. 2744.01(C)(1)(c).

**16.** Majority opinion at ¶ 27, quoting *Allied Erecting & Dismantling Co. v. Youngstown*, 151 Ohio App.3d 16, 2002-Ohio-5179, 783 N.E.2d 523.

{¶ 45} The majority notes that "the city, in an effort to encourage more residential housing projects, was administering various programs to pay for infrastructure improvements in subdivision developments that might not have otherwise attracted private investment." The amended complaint alleged that the programs were "to encourage development within the City limits." This is the conduct in which the city engaged.

{¶ 46} One of the core functions of a governmental entity is to foster, nurture, and guide residential development within its borders. It is such a core governmental function that municipalities are allowed to enact building and zoning codes without constitutional infirmity. Toward that end—of encouraging development within its borders—the city operated this program through its Community Development and Planning Department. Attracting private investment and encouraging development within the city limits through the facilitation of subdivision development is what governments, not private entities, do. In a case from the Sixth Appellate District, the court concluded that the administration of a program "to assist the clean up of vacant lots and abandoned houses" was a governmental function and entitled to immunity.[17]

{¶ 47} As this court has noted, "[t]he fact that the [government] contract[s] with a nongovernmental entity to perform these activities does not render the performance proprietary in nature. 'R.C. 2744.01(C) does not exclude from the definition of governmental functions those functions sometimes performed by private entities for political subdivisions.' "[18]

{¶ 48} For these reasons, I would conclude that the city was engaged in a governmental function to which immunity attached.

{¶ 49} But even if I were to agree to hold otherwise, the city would still be immune under R.C. 2744.03(A)(5)—a provision that restores immunity when the conduct "resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources, unless the judgment or discretion was exercised with malicious purpose, in bad faith or in a wanton or reckless manner."

{¶ 50} There can be no doubt that the conduct complained of here falls within this category. The majority concludes that the city "cannot claim 'discretion' in choosing to negligently administer [the department]." But negligence is not the standard. In a project in which the work was completed and the builders made a

---

**17.** *David v. Toledo Dept. of Community Dev.* (Mar. 2, 1990), Sixth Dist. No. L–89–229, 1990 WL 19408 (the court relied on both R.C. 2744.01(C)(1)(c) and R.C. 2744.01(C)(2)(q) for that determination).

**18.** *Peters v. Cincinnati* (1995), 105 Ohio App.3d 710, 712, 664 N.E.2d 1329, quoting *McCloud v. Nimmer* (1991), 72 Ohio App.3d 533, 595 N.E.2d 492.

profit, it is hard to imagine that the builders could come back and now claim that the city exercised its judgment in bad faith or in a wanton or reckless manner.

{¶ 51} As this court recently noted, "[t]he immunity provided by R.C. 2744.03(A)(5) ' "operates to protect political subdivisions from liability based upon discretionary judgments concerning the allocation of scarce resources * * *. The law of immunity is designed to foster freedom and discretion in the development of public policy while still ensuring that implementation of political subdivision responsibilities is conducted in a reasonable manner." ' "[19] The Tenth Appellate District held that when particular conduct is characterized by a high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning, government entities remain immune from liability.[20] That court was concerned that creating liability for such conduct "might jeopardize the quality and efficiency of government and endanger the creative exercise of political discretion and judgment." [21]

{¶ 52} Again, acknowledging that we must examine "what it is that the political subdivision is actually doing when performing the function," I return to the language of the complaint. The builders complained that the city had made certain representations concerning payments for the project, that it had improperly informed them of its intentions to allocate the infrastructure funds, and that it had failed to properly allocate the infrastructure funds to the project in an amount sufficient to cover the work to be done. In sum, the builders complained about the manner in which the city allocated its financial resources in this project. For this conduct, the city is entitled to immunity.

{¶ 53} The majority concludes by saying that "[w]hile the city may legitimately claim an exercise of discretion in establishing an infrastructure-improvements plan, it cannot claim 'discretion' in choosing to negligently administer it." This is not like a case where an entity exercises discretion on whether to use certain light poles but is then liable for the failure to maintain them.[22] Light-pole maintenance requires little independent discretion. In this case, the decision to award money for development was not on a par with the decision to replace rotting timber. The creation of the Community Development and Planning

---

**19.** *James v. Cincinnati*, 1st Dist. No. C–070367, 2008-Ohio-2708, 2008 WL 2312637, at ¶ 37, quoting *Frederick v. Vinton Cty. Bd. of Edn.*, Vinton App. No. 03CA579, 2004-Ohio-550, ¶ 36, 2004 WL 232129 quoting *Hall v. Ft. Frye Local School Dist. Bd. of Edn.* (1996), 111 Ohio App.3d 690, 699, 676 N.E.2d 1241.

**20.** *Bolding v. Dublin Local School Dist.* (June 15, 1995), 10th Dist. No. 94APE09–1307, 1995 WL 360227 *2.

**21.** Id.

**22.** *James*, 2008-Ohio-2708, 2008 WL 2312637.

Department represented an exercise of discretion. But so too did the decisions of that department. Those decisions required "a high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning." It is for this conduct that the city is entitled to immunity. And it is for this reason that I respectfully dissent.